PAUL H. SACCOCCIO, ESQ.  3600
66-037 Kamehameha Hwy. Suite #3
Haleiwa, HI 96712
Tel: (808) 637-7611
Email: sacco@hawaii.rr.com

STEPHEN M. SHAW, ESQ.  4336
P.O. Box 2353
Honolulu, Hawaii  96804
Tel: (808) 521-0800
Email: shawy001@gmail.com

Attorneys for Plaintiff
MATTHEW R. LEIMBACH

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| MATTHEW R. LEIMBACH, | ) | CIVIL NO. _____ |
| | ) | (EMTALA) |
| Plaintiff, | ) | |
| | ) | COMPLAINT; |
| | ) | JURY DEMAND; |
| vs. | ) | SUMMONS |
| | ) | |
| HAWAII PACIFIC HEALTH, | ) | |
| WILCOX MEMORIAL HOSPITAL, | ) | |
| KAUAI MEDICAL CLINIC, | ) | |
| and DOES 1-50, | ) | |
| | ) | |
| Defendants. | ) | |

1

## COMPLAINT

Plaintiff MATTHEW R. LEIMBACH, for claims for relief against Defendants as follows:

### INTRODUCTION/RESERVATION

1.      This Complaint is filed pursuant to the provisions of the Title 42, United States Code §1395dd, the Emergency Medical Treatment And Active Labor Act ("EMTALA") arising from the severe and permanent injuries suffered by Plaintiff MATTHEW R. LEIMBACH ("Matthew"). Plaintiff also seeks relief under the Declaratory Judgment Act. 28 USC §2201. Plaintiff Matthew reserves his right to pursue his State law tort claims against Defendants in State Courts, including claims for professional negligence, pursuant to Casumpang v. ILWU Local 142, 94 Haw 330, 337-38, 13 P.3d 1235 (2000).

### JURISDICTION/VENUE

2.      This action arises under the EMTALA. Jurisdiction is conferred by 28 USC §1331. Plaintiff was a resident of the State of Hawaii at the time of Defendant's acts, and still currently resides within the State of Hawaii. Defendants are residents of Hawaii or domiciled therein. The acts complained of occurred in Hawaii.

1

**FIRST CLAIM FOR RELIEF –EMTALA, 42 USC §1395dd(a)**

**COUNT I:  DISPARATE EXAMINATION IN RELATION TO SEVERE, ACUTE SYMPTOMS PRESENTED IN RELATION TO DEFENDANTS' PROCEDURES**

**PARTIES**

3.     Defendant HAWAII PACIFIC HEALTH is the parent entity to Kauai Medical Clinic ("KMC"), Defendant Wilcox Memorial Hospital ("WMH") and Defendant Wilcox Health System ("Wilcox"). In December of 2001, Wilcox and KMC merged. Collectively, said defendants are referred to herein as "Defendant Hospital".

4.     Plaintiff MATTHEW R. LEIMBACH ("Matthew") came to Defendants Hospital's emergency room on May 24, 2012, seeking examination or treatment for a medical condition.

5.     Defendant Hospital at all times relevant herein operated a hospital emergency department within the meaning of 42 USC §1395dd(a). The emergency department is located at 3420 Kuhio Highway, Lihue, Hawaii (Kauai) 96766. Defendant was required to comply with 42 USC §1395dd. Defendant is liable to Plaintiff for violating the statute, and/or respondeat superior for its agents/employees, for acts and omissions herein. Defendant is also liable to Plaintiff for failure to supervise, train, or terminate said agents or employees, who were acting outside of the scope of employment.

6.     At all times relevant herein it was within the Defendant Hospital's capability and duty to follow its procedures in the emergency room to screen patients, including Plaintiff, for flesh-eating bacteria (necrotizing fasciitis); or, for transfer to another facility in accordance with 42 USC §1395dd(b)(1)(B). Defendant Hospital was also required by 42 USC §1395dd to apply its screening for this disease uniformly, regardless of ability to pay.

7.     During May of 2012, Matthew sustained lacerations to his left foot in Indonesia in May of 2012. He returned to Kauai, Hawaii, on May 22, 2014. The next day, he hurt his left foot exiting from a vehicle. There was no cut to his foot from that incident.

8.     By May 24, 2012, Matthew was experiencing acute and increasing pain to his left foot. This foot was severely swollen and discolored. Also, Matthew was suffering from shortness of breath, a bitter taste in his mouth, as well as severe and acute flu-like symptoms, including fever, body-aches, headaches, nausea, dehydration, pain and vomiting.

9.     On May 24, 2012, Matthew initially went to Defendant Hospital's outpatient clinic, annexed to Defendant Hospital. Matthew informed the clinic staff that he had no insurance, a fact permeating the medical record. After taking his temperature and blood pressure, Defendant's employees abruptly sent Matthew to Defendant's annexed emergency room, claiming that his blood pressure was too

3

low for clinic services. The known provider screening, examining, and charting Matthew at the ER on 5/24/12 was an agent or employee of Defendant Hospital.

10.    At all times Defendant Hospital was aware when Matthew came to the emergency department, that he had marginal assets and no health insurance. Matthew's chart entries show "Medicaid" or "no insurance". Matthew was routed to a social worker for the indigent. If the paperwork was approved, Defendant Hospital would be paid by Medicaid or Med Quest, if at all; and at a significant reduction. On May 25, 2012, Med-Quest (Kauai) sent Matthew a request for more information to complete his pending application. The fact of low Medicaid/Medicare hospital reimbursement must here be judicially noticed:

> "…numerous studies that show that patients on Medicaid, our national government-run health-care program for the poor, do far worse on health outcomes than do those on private insurance, and in some cases, worse than those with *no insurance at all*….
> … …
> … …
> Why does this occur? The main reason is that Medicaid underpays doctors and hospitals to care for Medicaid beneficiaries. Medicaid's reimbursement rates are around half of those paid by private insurers. In many cases, Medicaid pays doctors less than it costs to care for Medicaid patients, meaning that doctors face the choice of caring for the poor, and going broke, or shutting their doors to Medicaid patients." ***Forbes 3/10/12 Article: "New Study: Expanding Medicaid Reduces Access to Health Care"*** (*by Google search: "Medicaid Reduces Access"*). Emphasis added.
>
> Website location:
> http://www.forbes.com/sites/aroy/2012/03/10/new-study-expanding-medicaid-reduces-access-to-health-care/

4

11.     On May 24, 2012 on or about 12:16 p.m. Matthew was admitted to the emergency room at Defendant Hospital. He presented compelling risk factors for necrotizing fasciitis. Defendant Hospital provided a screening examination that was not comparable to other patients with similar symptoms. As only one example, Plaintiff was informed by Defendant's nurse that Wilcox patients with his symptoms were given an MRI or "CAT scans". Defendant perceived Matthew to have these risk factors: (1) recent lacerations to involved area (2) blunt trauma to the same area (left foot). Unknown to Matthew, Defendant perceived Matthew to have a high white blood cell count (WBC) and a low sodium level. In addition to low blood pressure, Defendant Hospital perceived the following acute and severe symptoms to alert Defendant's emergency physician and staff of the need for immediate medical attention to prevent the serious bodily injury which resulted: Matthew was experiencing acute and increasing pain to his left foot. His foot was severely swollen and discolored. Also, Defendant perceived that Matthew was suffering from severe and acute flu-like symptoms, including fever, headaches, nausea, dehydration, pain and vomiting.

12.     The examination provided in Defendant Hospital's emergency department was admittedly not in compliance with Defendant's procedures.

13.     "Research supports that the most important predictor of morbidity and mortality in this severe life threatening infection is the time interval between the

5

onset of symptoms and definitive surgical therapy. Necrotizing fasciitis is a progressive, rapidly spreading inflammatory infection located in the deep fascia, causing secondary necrosis of the subcutaneous tissues. For treatment of necrotizing fasciitis to be successful, this condition must be diagnosed early on with administration of broad-spectrum antibiotics and rapid surgical debridement of the involved area. Once necrotizing fasciitis is suspected as **[\*\*33]** being present, the patient should be immediately taken to the operating room to open up the surgical wound and debride the infected tissue." 255 S.W.3d 665 pg 678.

14.    Defendant Hospital's nurse informed Matthew that the Hospital normally used scans, either MRI or CAT scans, for symptoms like his; but the Hospital could not use its scan equipment for him, as the machine was "down". These is no indication in the chart that any imaging equipment was "down", or that Defendant attempted to transfer to another facility pursuant to 42 USC §1395dd(b)(1)(B).

15.    Defendant Hospital's disparate, cost-saving, examination and tests were not designed to identify the symptoms of Matthew's necrotizing fasciitis. For example, Defendant Hospital's employees were not even going to give Matthew a blood test. Plaintiff was instead forced to beg and plead for a blood test.

16.    The Defendant's disparate and/or cursory emergency room examination did not determine whether an emergency condition existed despite

6

acute symptoms herein of sufficient severity such that immediate medical attention could reasonably be expended to result in Matthew's death.

17.     Defendant Hospital treated Plaintiff differently by withholding key procedures used to diagnose necrotizing fasciitis, including, without limit, a diagnostic incision to search for infection, ultrasound of the left foot near the laceration site, as well as other scans, including an MRI or CT. The MRI would have permitted the visualization of tissue edema in the fasciitis planes for localization of necrotic tissue and fluid accumulation. After eventual transfer by Medivac to Queen's on 5-31-12, an MRI was used to help diagnose Matthew and save his life.

18.     The disparate, cost-saving examination done by Defendant Hospital, however, was <u>not</u> designed to identify acute and severe symptoms. Instead, the examination was prextual, and not an "appropriate" screening in the context of Matthew's acute and cumulative symptoms and risk factors, pursuant to EMTALA. The examination was not comparable to the one offered to other patients presenting similar symptoms.

19.     After this disparate, cursory, "drive-by" examination for a sprain and viral infection by Defendant Hospital on May 24, 2012, Matthew was sent home. He was diagnosed with merely an unspecified viral infection (coded 079.99) and a

sprain (coded 845.00). Even if the examination was not disparate, it was so cursory that it was not designed to identify Matthew's acute and severe symptoms.

20.    By providing an insufficient, discriminatory, cost-saving and/or cursory examination in relation to the severe, acute, and cumulative symptoms; together with the risk factors presented by Matthew as aforesaid, Defendant Hospital violated 42 USC§1395dd. The violation of Defendant's statutory duties, in turn, was the direct, proximate and/or legal cause or substantial factor in causing the nature and extent of the severe permanent injuries to Matthew which followed. In short, Plaintiff directly suffered a lost chance of very early recovery from necrotizing fasciitis caused by Defendant Hospital's EMTALA violation.

21.    As a direct, proximate and/or legal cause of Defendant Hospital's acts, violations, omissions, and breaches of duty as aforesaid, Plaintiff Matthew suffered severe physical injury, including very painful injuries to his ankle, leg, back, kidneys and heart muscles. Skin and muscle had to be removed from his ankle, lower left leg, and side due to necrosis; and also to graft tissue to his leg. He has permanent scarring, deformity and discoloration, as well as limited range of motion and pain in his left leg.

22.    As a further direct, proximate and/or legal cause of Defendant Hospital's acts, violations and omissions as aforesaid, Plaintiff suffered anxiety,

fear, loss of sleep, extreme distress and lost wages all to Plaintiff's damage, according to proof.

23.   As a further direct, proximate and/or legal cause of Defendant Hospital's aforesaid acts, violations and omissions, Plaintiff was required to divert substantial resources and time to deal with injury and damages caused by Defendant, all to Plaintiff's injury and financial loss, according to proof.

24.   As a direct, proximate and/or legal result of Defendant Hospital's aforesaid acts, violations and omissions, causing injuries to Plaintiff, Plaintiff has sustained special and general damages, in amounts to be shown by proof at the time of trial.

25.   In committing Defendant Hospital's acts, violations, omissions and breaches of duty alleged herein, Defendant acted oppressively, wantonly, recklessly, maliciously, and fraudulently, with a conscious disregard of the Plaintiff's rights, with the intention of benefiting said Defendant financially; with such malice as implies a spirit of mischief or criminal indifference to civil obligations, or willful conduct; or, an entire want of care raising the presumption of a conscious indifference to consequences, and with the intention of causing, or recklessly disregarding the probability of causing, injury to Plaintiff, justifying imposition of exemplary damages against Defendant.

26.     Defendant Hospital as a principal, franchisor, or as an employer, had advance knowledge of the unfitness of employees or agents involved herein, and employed them with a conscious disregard of the rights or well-being of others and ratified the wrongful conduct for which damages are claimed. The oppression, recklessness, fraud or malice of Defendant's employees or agents was done on the part of one or more of Defendant's officers, directors, or managing agents. In so acting, the Defendant acted recklessly; or intended to, and did, vex, annoy, injure and harass Plaintiff. As a result of such conduct, Plaintiff is entitled to exemplary and punitive damages, according to proof, against Defendant.

**COUNT II:     DISPARATE EXAMINATION AS JUDGED BY MEDICAL PROFESSION**

27.     Plaintiff realleges the foregoing paragraphs and incorporates them as through fully set forth herein.

28.     The examination provided in the Defendant Hospital's emergency department was not identical to that provided to similarly-situated patients as judged by the medical profession.

**COUNT III:     CURSORY EMERGENCY ROOM EXAMINATION IN RELATION TO SEVERE, ACUTE SYMPTOMS PRESENTED**

29.     Plaintiff realleges the foregoing paragraphs and incorporates them as through fully set forth herein.

30.     On May 24, 2014, Defendant Hospital negligently, intentionally, or recklessly provided Matthew with an examination so cursory that it was not designed to identify the acute and severe symptoms which alerted Defendant Hospital of the need for immediate medical attention.

31.     Defendant Hospital's cursory examination could not, and did not, identify just some of Matthew's cumulative symptoms as acute and severe symptoms of necrotizing fasciitis, as follows:

A.     Severe pain in left foot;

B.     Local evidence of abrasion; cut or contusion at left foot, also blunt trauma;

C.     High temperature (fever);

D.     Flu-like symptoms: vomiting, fever, in pain, headaches, weakness;

E.     lack of respiratory symptoms;

F.     High white blood cell count;

G.     Low sodium;

H.     Low blood pressure.


**SECOND CLAIM FOR RELIEF – EMTALA – 42 USC §1395dd(a)**

**COUNT I:  DISPARATE EXAMINATION IN RELATION TO SEVERE, ACUTE SYMPTOMS PRESENTED IN RELATION TO DEFENDANTS' PROCEDURES**

11

32.     Plaintiff realleges the foregoing paragraphs and incorporates them as through fully set forth herein.

33.     From May 25 to May 27, 2012 (Sunday), Matthew's temperature climbed to 104° frequently, and did not go below 100°. He was dehydrated. He called the aforesaid emergency room and was told to take more Ibuprofen. By Sunday, Matthew's ankle had become extremely swollen and discolored. Matthew felt like he was very sick with the flu.

34.     On Sunday, May 27, 2012 at about 9:10 p.m., Matthew was admitted the second time Defendant Hospital's emergency room by employees of Provider Hospital. His forms indicated: "CV6: MED QUEST." Defendant's employees gave Matthew some fluids and let him spend the night in the emergency room.

35.     Once again, Defendant Hospital's disparate and/or cursory examination could not possibly identify just some of Matthew's cumulative, and by now, extremely obvious symptoms as acute and severe symptoms of necrotizing fasciitis, as follows:

> A.     Increasing, severe pain in left foot;
>
> B.     Local evidence of abrasion; cut or contusion at left foot, also blunt trauma;
>
> C.     Very high temperature (fever);
>
> D.     Flu-like symptoms: vomiting, fever, in pain, headaches, weakness;
>
> E.     lack of respiratory symptoms;

12

F.      High white blood cell count;

G.      Bandemia;

H.      Failing Platelets;

I.      Hypotension;

J.      Volume depletion;

K.      "Suggesting" "early sepsis".

### COUNT II:      DISPARATE EXAMINATION AS JUDGED BY MEDICAL PROFESSION

36.     Plaintiff realleges the foregoing paragraphs and incorporates them as through fully set forth herein.

37.     The examination provided in Defendant Hospital's emergency department was admittedly not in compliance with Defendant's procedures.

### COUNT III:      CURSORY EMERGENCY ROOM EXAMINATION IN RELATION TO SEVERE, ACUTE SYMPTOMS PRESENTED

38.     Plaintiff realleges the foregoing paragraphs and incorporates them as through fully set forth herein.

39.     On May 27, 2014, Defendant Hospital negligently, intentionally, or recklessly provided Matthew with an examination so cursory that it was not designed to identify the acute and severe symptoms which alerted Defendant Hospital of the need for immediate medical attention

13

**THIRD CLAIM FOR RELIEF – EMTALA – 42 USC §1395dd(b)**

40.    Plaintiff realleges the foregoing paragraphs and incorporates them as through fully set forth herein.

41.    Defendant Hospital sought to escape liability under EMTALA by admitting Plaintiff, with no intention of treating his necrotizing fasciitis. With the assistance of Defendant's Hospitalist, Defendant Hospital made it clear that Defendant Hospital would not treat the patient's actual condition.

42.    As stated, on May 24, 2012, Defendant Hospital's emergency physician sent Matthew home. His instructions were: (1) to use Tylenol or ibuprofen for fever and chills, (2) stay hydrated, (3) bed rest, and (4) use crutches for the ankle and elevate the leg.

43.    By May 27, 2012, the flesh-eating bacteria consuming Matthew's ankle and leg tissue had driven his fever, pain and dehydration to unbearable heights.

44.    On May 27, 2012 at 9:10 p.m. (time: 2100), Matthew was again admitted to Defendant Hospital's emergency room as aforesaid. He was still uninsured or underinsured. His admission documents state "CVG MED QUEST *MED QUEST"

45.    After May 27, 2012, a High Priority chart note was entered, stating in part, as follows: "Brought to OR … yesterday with findings of purulent drainage

14

from leg, fascia looked intact, small amounts of necrotic muscle. Possible very early necrotizing fasciitis. Cultures growing Group A Strep."

46.    On May 28, 2012 at 10:35 p.m., Defendant's general surgeon obtained a consent for treatment from Matthew for the following: "condition(s) in professional and lay language: PROFESSIONAL: cellulitis of left leg, possible abscess, possible fasciitis."

47.    After surgery, on or about May 28, 2012, Matthew was seen by Defendant Hospital's Hospitalist, tasked with the efficient use of hospital and healthcare resources. This physician at that point assured Matthew that he <u>did</u> <u>not</u> <u>have</u> necrotizing fasciitis.

48.    The medical chart indicates that on May 29, 2012 at 8:30 a.m., there was a telephone update with Defendant Hospital's Hospitalist as follows: "no new orders."

49.    On May 29, 2012, Defendant's surgeon obtained a consent to treat Matthew for the following "condition(s) in professional and lay language. PROFESSIONAL: soft tissue infection left leg."   Defendant Hospital thereby reversed May 28, 2012 diagnosis of "possible fasciitis".

50.    The emergency medical condition that was "detected" by Defendant Hospital (unspecified viral infection) was never stabilized by Defendant Hospital.

## FOURTH CLAIM FOR RELIEF – DECLARATORY JUDGMENT (28 USC §2201)

51.     Plaintiff realleges the foregoing paragraphs and incorporates them as through fully set forth herein.

52.     HRS §671-1 (2013) includes as its definition of a "medical tort" "an error or omission in professional practice by a health care provider, which proximately causes death, injury or other damage to a patient."

53.     HRS §671-12 provides in part: "**(a)** Any person or the person's representative having concerns regarding the existence of a medical tort shall submit an inquiry to the medical inquiry and conciliation panel before a suit based on the circumstances of the inquiry may be commenced in any court of this State. Inquiries shall be submitted to the medical inquiry and conciliation panel in writing and shall include the facts upon which the inquiry is based and the names of all parties against whom the inquiry is or may be made who are then known to the person or the person's representative."

54.     HRS §671-18 provides: "The filing of the inquiry with the medical inquiry and conciliation panel or with an approved or agreed upon alternative dispute resolution provider shall toll any applicable statute of limitations, and the statute of limitations shall remain tolled until sixty days after the termination of the panel or the notification of completion from the approved or agreed upon

16

alternative dispute resolution provider is mailed or delivered to the parties. If panel proceedings are not completed within twelve months, or the alternative dispute resolution process is not completed within twelve months, the statute of limitations shall resume running and the party filing the inquiry may commence a suit based on the circumstances related to the inquiry in any appropriate court of this State. The panel or the approved or agreed upon alternative dispute resolution provider shall notify all parties in writing of this provision."

55.     Based upon the foregoing incorporated claims, the adversarial relationship between the parties has sufficiently crystalized as to permit the Court to render declaratory judgment.

56.     Because HRS §671-18 tolls certain relevant statutes of limitations, the statute's requirements are not properly incorporated into the EMTALA. Indeed, a U.S. District Court observed in Sanders v. Palomar Med Ctr., 2010 U.S. Dist. 65120 (S.D. Ca 2010) *13: "The Ninth and Second Circuits however, have held that where a state notice statute merely requires a plaintiff to file a notice of claim before commencing a civil action, and does not provide for tolling, the state's requirements may actually be incorporated into EMTALA." (Emphasis added, footnotes omitted).

57.     An actual and substantial controversy exists between the parties regarding whether EMTALA claims are cognizable in the Hawaii MICP.

17

**WHEREFORE,** Plaintiffs demand judgment against Defendant as follows:

a.  For general and special damages in amounts that will be proven at trial; and Plaintiffs further state that the amount of their damages as asserted herein falls within the jurisdictional requirements of this honorable Court.

b.  Punitive damages;

c.  Interest as allowed by law;

d.  For declaratory judgment that Hawaii's MICP excludes claims brought pursuant to the EMTALA;

e.  Plaintiffs' costs of suit; and

f.  Such other and further relief as this Court deems just and proper.

DATED:    Honolulu, Hawaii, May 23, 2014.

/s/ *STEPHEN M. SHAW*

_____

PAUL H. SACCOCCIO
STEPHEN M. SHAW
Attorneys for Plaintiff
MATTHEW R. LEIMBACH