PAUL H. SACCOCCIO, ESQ.  3600
66-037 Kamehameha Hwy. Suite #3
Haleiwa, HI 96712
Tel: (808) 637-7611
Email: sacco@hawaii.rr.com

STEPHEN M. SHAW, ESQ.  4336
P.O. Box 2353
Honolulu, Hawaii  96804
Tel: (808) 521-0800
Email: shawy001@gmail.com

Attorneys for Plaintiff
MATTHEW R. LEIMBACH

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| MATTHEW R. LEIMBACH, | ) | CIVIL NO.  14-00246 JMS-RLP |
| | ) | (EMTALA) |
| Plaintiff, | ) | |
| | ) | FIRST AMENDED COMPLAINT; |
| | ) | JURY DEMAND; |
| vs. | ) | SUMMONS |
| | ) | |
| HAWAII PACIFIC HEALTH, | ) | |
| WILCOX MEMORIAL HOSPITAL, | ) | |
| KAUAI MEDICAL CLINIC, | ) | |
| WILCOX HEALTH SYSTEM, | ) | |
| and DOES 1-150, | ) | |
| | ) | |
| Defendants. | ) | |

## EXHIBIT "A"

1

# FIRST AMENDED COMPLAINT

Plaintiff MATTHEW R. LEIMBACH, for claims for relief against Defendants as follows:

## INTRODUCTION/RESERVATION

1.      This Complaint is filed pursuant to the provisions of the Title 42, United States Code §1395dd, the Emergency Medical Treatment And Active Labor Act ("EMTALA") arising from the severe and permanent injuries suffered by Plaintiff MATTHEW R. LEIMBACH ("Matthew"). Plaintiff also seeks relief under the Declaratory Judgment Act. 28 USC §2201. Plaintiff Matthew reserves his right to pursue his State law tort claims against Defendants in State Courts, including claims for professional negligence, pursuant to Casumpang v. ILWU Local 142, 94 Haw 330, 337-38, 13 P.3d 1235 (2000).

## JURISDICTION/VENUE

2.      This action arises under the EMTALA. Jurisdiction is conferred by 28 USC §1331. Plaintiff was a resident of the State of Hawaii at the time of Defendant's acts. Defendants are residents of Hawaii, or domiciled therein. The acts complained of occurred in Hawaii.

## FIRST CLAIM FOR RELIEF –EMTALA, 42 USC §1395dd(a)

### COUNT I:  DISPARATE OR INAPPRORIATE EXAMINATION IN RELATION TO SEVERE, ACUTE SYMPTOMS PRESENTED

### PARTIES

3.      Defendant HAWAII PACIFIC HEALTH ("HPH") is a non-governmental corporation. Kauai Medical Clinic ("KMC") and Defendant Wilcox Memorial Hospital ("WMH") are wholly-owned subsidiaries of HPH. Defendant Wilcox Health System ("Wilcox") is, on information and belief, a wholly owned subsidiary of HPH. In December of 2001, on information and belief, Wilcox and KMC merged. Collectively, said defendants are referred to herein as "Defendant Hospital" or "HPH").

4.      Plaintiff MATTHEW R. LEIMBACH ("Matthew") came to Defendant Hospital's emergency room on May 24, 2012, seeking examination or treatment for a medical condition.

5.      Defendant Hospital at all times relevant herein operated a hospital emergency department within the meaning of 42 USC §1395dd(a). The emergency department is located at 3420 Kuhio Highway, Lihue, Hawaii (Kauai) 96766. Defendant was required to comply with 42 USC §1395dd. Defendant is liable to Plaintiff for violating the statute; and/or pursuant to respondeat superior for its agents/employees, and their acts and omissions herein. Defendant is also liable to

2

Plaintiff for failure to supervise, train, or terminate said agents or employees, who were acting outside of the scope of employment.

6.      At all times relevant herein it was within the Defendant Hospital's capability to screen patients, including Plaintiff, for flesh-eating bacteria (necrotizing fasciitis); or, for transfer to another facility in accordance with 42 USC §1395dd(b)(1)(B). Defendant Hospital was also required by 42 USC §1395dd to apply its screening for this disease uniformly. Uniform screening was required regardless of ability to pay.

## FACTUAL BACKGROUND

7.      During May of 2012, Matthew sustained mosquito bites and lacerations to his left foot during a three-week surf trip to Indonesia. Mr. Leimbach returned to Kauai, Hawaii, on May 22, 2014. The next day, he hurt his left foot exiting from a moving truck. There was no cut to his foot from that incident.

8.      By May 24, 2012, Matthew was experiencing acute and increasing pain to his left foot. This foot was severely swollen and discolored. Also, Matthew was suffering from shortness of breath, a bitter taste in his mouth, as well as severe and acute flu-like symptoms, including fever, body-aches, headaches, nausea, dehydration, pain and vomiting.

9.      On May 24, 2012, Matthew initially went to Defendant Hospital's outpatient clinic, annexed to Defendant Hospital. Matthew informed the clinic staff

3

that he had no job or insurance. These facts permeated the medical record. He also presented the above risk factors and symptoms to clinic staff. After taking his temperature (100.2°F), and blood pressure (81/38), Defendant's clinic employees abruptly wheeled Matthew to Defendant's annexed emergency room on a gurney, claiming that his blood pressure was extremely low - too low for clinic services. The providers screening, examining, charting and admitting Matthew to the ER on 5/24/12 were agents or employees of Defendant Hospital.

10. At all times Defendant Hospital was aware when Matthew came to the emergency department, that he had marginal assets and no health insurance. Matthew's chart entries show "Medicaid" or "no insurance". Matthew was routed to a social worker for the indigent. If the paperwork was approved, Defendant Hospital would be paid by Medicaid or Med Quest, if at all; and as Defendants knew at a significant reduction.

11. On May 24, 2012 on or about 12:16 p.m. when Matthew was admitted to the emergency room at Defendant Hospital, he presented compelling risk factors for necrotizing fasciitis (NF): During May of 2012, Matthew sustained mosquito bites and lacerations to his left foot during a three-week surf trip to Indonesia in May of 2012. Mr. Leimbach returned to Kauai, Hawaii, on May 22, 2014. The next day, he hurt his left foot exiting from a moving truck. There was no cut to his foot

4

from that incident. He had pain and swelling in his left foot and flu-like symptoms, among other problems.

12.   The medical screening examination provided to Matthew by Defendant's Emergency Department ("ED") was not appropriate since it was not designed to identify the acute and severe symptoms presented so as to alert the Emergency Department staff of the need for immediate medical attention to prevent the serious bodily injury which resulted. The relevant criteria for NF, met by Matthew, included: (1) pain, (B) high temperature, (C) evidence of trauma, laceration/abrasions or mosquito bites at body site, (D) hypotension (low blood pressure), (E) fever, dehydration and flu like symptoms, coupled by a lack of history of close contacts with influenza – like illness, (F) focal pain and swelling at left foot, (G) history of blunt trauma at site in 40% of the patients, (H) elevated WBC, and (I) low sodium ($< 135$).

13.   The foregoing risk factors and criteria indicating NF, when matched with the screening examination Matthew received from Defendant's ED, demonstrated that the medical screening by Defendant's ED on May 24, 2012 was not appropriate, and did not identify the emergency medical condition that was manifested by the risk factors and criteria above, and the following verified symptoms and procedures from Defendant's incomplete and misleading chart:

A.    "The patient states he was exposed to possible malaria with mosquito bites and did not use any malaria prophylaxis."

B.    "ANKLE INJURY (it [sic] ankle pain after jumping out of a truck yesterday)"

C.    "fever, body aches and nausea and vomiting. These symptoms have been ongoing for 2 days."

D.    "Review of systems

      Constitutional: Positive for fever.
      …
      Gastrointestinal: Positive for vomiting…
      …
      Musculoskeletal: Positive for myalgias…
      …
      Neurological: Positive for headaches."

E.    "Vital Signs: temp 37.5°C (99.5 °F) Oral, Pulse: 85, Resp: 20, BP: 118/56 mmHg, Sp 02: 97% 02 mode: Room air". **Note**, the clinic saw Plaintiff just before the ED. Yet, the ED chart does not reflect the <u>higher</u> fever and lower blood pressure measured in the clinic.

F.    "Differential Diagnosis: viral syndrome, otitis media, pharyngitis, pneumonia, gastroenteritis, urinary tract infection and others".

G.    "Medications given in the Emergency Department include: sodium chloride 0.9% 100 mL. 1000 mL intravenous".

H.    "LABS…

    1. CBC PLT W/AUTO DIFF
        WBC (10/9/L) 14.9 (*)

    2. COMP METABOLIC PANEL
        Sodium (mmol/L) 133
        …
        Creatinine (mg/dL) 1.03
        …
        Glucose (mg/dL) 127 (*)

    3. URINALYSIS, COMPLETE
        …
        Blood Large (*)
        …
        Bacteria (Inpf) occ (*)

I.    "ED Course … There was no sign of malaria or influenza…"

J.    "ED Prescriptions
        None"

K.    "Diagnostic Impression:  Viral infection. Sprain of ankle"

L.    "Orders

        …
        XR ANKLE…
        …
        Questions: Clinical Indications or Reason for Exam? Injured left ankle yesterday and now increased pain to ambulate"

7

M.   "Lab Results

…

XR ANKLE

…

Moderate soft tissue swelling about the left ankle noted."

N.   "Discharge Info… Follow-up information … Make an appointment in 4 days."

O.   "Discharge Instructions

… Follow up in the urgent care, clinic next week for a reexamination next week and check your lab results."

P.   "Pain Assessment

Intensity 5

Location Head

Duration Constant"

14.   The foregoing acute and severe symptoms manifested by Matthew could have been identified by Defendant's ED as an emergency medical condition (NF) had the screening examination been applied with an even hand, to authorize an MRI and immediate surgical intervention and/or biopsy. Defendant hospital provided a medical screening examination that was not comparable to other patients with similar symptoms, and Matthew was provided a screening materially different than other patients similarly situated. For example, on May 24, 2012, Plaintiff was informed by Defendant's nurse that Wilcox patients with his

8

symptoms were given scans (MRI or "CAT scan"). Matthew was not given an MRI or CT scan on May 24, 2012.

15.     Several more examples of disparate screening provided to Matthew on May 24, 2012 follow. In March of 2012, toddler Kellen Nitta presented to Wilcox on Kauai with swelling of an extremity (arm) and high fevers, as here (except Matthew's foot was swollen). In Kellen's case, (as here), the staff did a lot of tests but could not determine what was wrong.

16.     Unlike Matthew's case, Defendant Hospital promptly transferred Kellen to HPH's Kapiolani hospital by Medivac, where Kellen received an MRI and a diagnosis of NF. Kellen spent nearly a month in the hospital. He was the second victim of NF after John Stem, 49, of Lihue – also at Defendant's Wilcox Hospital in March of 2012.

17.     On Sunday, February 5, 2012, 31year-old Kolohe Kapu presented to Defendant Hospital with temperatures of 102 °F and 103 °F (Matthew was at 100.2°F with extremely low blood pressure at the clinic before clinic staff wheeled him to the Wilcox ED by gurney). Like Matthew, Mr. Kapu also presented with flu-like symptoms. After tests (unlike Matthew) Mr. Kapu went straight to surgery. Mr. Kapu spent about 26 days in the hospital. Id.

18.     In 2007, Gary Aguilar, a business owner from San Francisco, fell ill after cutting himself while swimming at Poipu Beach on Kauai. Like Plaintiff

9

Matthew Leimbach, Mr. Aguilar presented to Defendant Hospital with flu-like symptoms and a swollen leg. Unlike Matthew, Mr. Aguilar was admitted to Defendant's Wilcox Hospital. Mr. Aguilar nearly died at Wilcox during a six-week hospitalization.

19.     Defendant violated the EMTALA because it failed to provide Plaintiff with examination comparable to the screening offered to other patients presenting similar symptoms. The other patients (as well as others yet undisclosed by Defendant) were provided appropriate screening in that the examination was designed to <u>identify</u> the acute and severe symptoms presented.

20.     The importance of an even-handed approach is a matter of life or death. Research supports that the most important predictor of morbidity and mortality in this severe life threatening infection is the time interval between the onset of symptoms and definitive surgical therapy. Necrotizing fasciitis is a progressive, rapidly spreading inflammatory infection located in the deep fascia, causing secondary necrosis of the subcutaneous tissues. None of Defendant Hospital's procedures provided to Matthew were an appropriate screening under the EMTALA. For treatment of necrotizing fasciitis to be successful, symptoms must be identified early and there must be administration of broad-spectrum antibiotics, and rapid surgical debridement of the involved area. The screening examination by Defendant was not appropriate because it could not identify the

relevant emergency medical conditions. Once necrotizing fasciitis is suspected as being present for example, the patient should be immediately taken to the operating room to open up the surgical wound and debride the infected tissue.

21.　Defendant Hospital's disparate, cost-saving, examination and tests (billed $374.00) were not designed to identify the symptoms of Matthew's necrotizing fasciitis, a condition which Defendant knew would result in at least thirty (30) days in the hospital and multiple surgeries. In addition to the inappropriate screening as aforesaid, Defendant Hospital's employees were not even going to give Matthew a blood test. Plaintiff was instead forced to beg and plead for a blood test.

22.　The Defendant's disparate or inappropriate emergency room medical screening examination did not determine whether an emergency condition existed, despite acute symptoms herein of sufficient severity such that immediate medical attention could reasonably be expected to prevent Matthew's death or disability.

23.　Defendant Hospital treated Plaintiff differently by withholding key procedures used with other patients to identify acute and serve symptoms of necrotizing fasciitis, including, without limit, a diagnostic incision to search for infection, ultrasound of the left foot near the laceration site, as well as other scans, including an MRI (as with Kellen Nitta) or CT. The MRI would have permitted the visualization of tissue edema in the fasciitis planes for localization of necrotic

11

tissue and fluid accumulation. After eventual transfer by Medivac to Queen's on 5-31-12, an MRI was used to help diagnose Matthew and save his life. The same scenario occurred with Kellen Nitta, except with great speed (Kellen was not diagnosed by HPH's Kapiolani Hospital, until he received an MRI in Honolulu).

24.     The disparate, cost-saving examination done by Defendant Hospital, however, was <u>not</u> designed to identify acute and severe symptoms. Instead, the medical screening examination was prextual, and not an "appropriate" screening in the context of Matthew's acute and severe symptoms and risk factors, as required by the EMTALA. The examination was not comparable to the one offered to other patients presenting similar symptoms, including (without limit) those few identified supra.

25.     After this disparate screening medical examination for a sprain and viral infection by Defendant Hospital on May 24, 2012, Matthew was sent home to get over an unspecified viral infection (coded 079.99) and a sprain (coded 845.00).

26.     From May 25 to May 27, 2012 (Sunday), Matthew's temperature climbed to 104° frequently, and did not go below 100°. He was still dehydrated. He called Defendant's emergency room and was told to take more Ibuprofen. Defendant failed to chart the call. By Sunday, Matthew's ankle had become extremely swollen and discolored. Matthew still felt like he was very sick with the flu.

27.     On Sunday, May 27, 2012 at about 9:10 p.m., Matthew was admitted the second time to Defendant Hospital's emergency room by employees of Provider Hospital. His forms indicated: "CV6: MED QUEST." Defendant's employees gave Matthew some fluids and gratuitously let him spend the night in the emergency room.

28.     As with the May 24, 2012 emergency room screening as realleged, Defendant Hospital's disparate and/or cursory or inappropriate medical screening examination (without an MRI and biopsy) could not possibly identify just some of Matthew's extremely obvious conditions as acute and severe symptoms of necrotizing fasciitis. By May 27, 2012, Matthew presented to the Defendant emergency room:

    A.    Increasing, severe pain in left foot;

    B.    Local evidence of insect bites, abrasion; cut or contusion at left foot during a 30-day surf trip to Indonesia, also blunt trauma;

    C.    Very high temperature (fever);

    D.    Flu-like symptoms: vomiting, fever, in pain, headaches, weakness;

    E.    lack of respiratory symptoms;

    F.    High white blood cell count;

    G.    Bandemia;

    H.    Failing Platelets;

    I.    Hypotension;

        J.      Volume depletion;

        K.      "Suggesting" "early sepsis" (chart note).

29.     By providing an inappropriate, discriminatory, cost-saving and/or a cursory medical screening examination in relation to the severe and acute symptoms; together with the risk factors presented by Matthew as aforesaid, Defendant Hospital violated 42 USC§1395dd. The violation of Defendant's statutory duties, in turn, was the direct, proximate and/or legal cause or substantial factor in causing the nature and extent of the severe permanent injuries to Matthew which followed. In short, Plaintiff directly suffered a lost chance of very early recovery, all proximately and legally caused by Defendant Hospital's EMTALA violation.

30.     As a direct, proximate and/or legal cause of Defendant Hospital's acts, violations, omissions, and violation of EMTALA as aforesaid, and as alleged infra, Plaintiff Matthew suffered severe physical injury, including very painful injuries to his ankle, leg, back, kidneys and heart muscles. Skin and muscle had to be removed from his ankle, lower left leg, and side due to necrosis; and also to graft tissue to his leg. He has permanent scarring, deformity and discoloration, as well as limited range of motion and pain in his left leg.

31.     As a further direct, proximate and/or legal cause of Defendant Hospital's acts, violations of EMTALA and omissions as aforesaid, Plaintiff

suffered anxiety, fear, loss of sleep, extreme distress and lost wages all to Plaintiff's damage, according to proof.

32.     As a further direct, proximate and/or legal cause of Defendant Hospital's aforesaid acts, violations of EMTALA and omissions, Plaintiff was required to divert substantial resources and time to deal with injury and damages caused by Defendant, all to Plaintiff's injury and financial loss, according to proof.

33.     As a direct, proximate and/or legal result of Defendant Hospital's aforesaid acts, violations of EMTALA and omissions, causing injuries to Plaintiff, Plaintiff has sustained special and general damages, in amounts to be shown by proof at the time of trial.

34.     In committing Defendant Hospital's acts, violations of EMTALA, omissions and alleged herein, Defendant acted oppressively, wantonly, recklessly, maliciously, and fraudulently, with a conscious disregard of the Plaintiff's rights, with the intention of benefiting said Defendant financially; with such malice as implies a spirit of mischief or criminal indifference to civil obligations, or willful conduct; or, an entire want of care raising the presumption of a conscious indifference to consequences, and with the intention of causing, or recklessly disregarding the probability of causing, injury to Plaintiff, justifying imposition of exemplary damages against Defendant.

35.     Defendant Hospital as a principal, franchisor, or as an employer, had advance knowledge of the unfitness of employees or agents involved herein, and employed them with a conscious disregard of the rights or well-being of others and ratified the wrongful conduct for which damages are claimed. The oppression, recklessness, fraud or malice of Defendant's employees or agents was done on the part of one or more of Defendant's officers, directors, or managing agents. In so acting, the Defendant acted recklessly; or intended to, and did, vex, annoy, injure and harass Plaintiff. As a result of such conduct, Plaintiff is entitled to exemplary and punitive damages, according to proof, against Defendant.

**COUNT II:**     **INAPPROPRIATE OR CURSORY EMERGENCY ROOM EXAMINATION IN RELATION TO SEVERE, ACUTE SYMPTOMS PRESENTED**

36.     Plaintiff realleges the foregoing paragraphs and incorporates them as though fully set forth herein.

37.     On May 24, 2014, Defendant Hospital provided a medical screening examination to Plaintiff Matthew Leimbach which so cursory or inappropriate that it was not designed to identify the acute and severe symptoms which would alert Defendant Hospital of the need for immediate medical attention.

38.     Defendant Hospital's cursory screening (billed at $374.00), while consisting of several tests, as aforesaid, was nonetheless inappropriate or cursory in

that it was not designed to identify the foregoing acute and severe symptoms hereinabove alleged.

**COUNT III:** **DISPARATE OR INAPPROPRIATE EMERGENCY ROOM EXAMINATION IN RELATION TO SEVERE, ACUTE SYMPTOMS PRESENTED IN VIOLATION OF DEFENDANT'S PROCEDURES**

39.    Plaintiff realleges the foregoing paragraphs and incorporates them as though fully set forth herein.

40.    The examination provided in Defendant Hospital's emergency department was admittedly not in compliance with Defendant's procedures.

41.    At all times herein, it was within Defendant Hospital's duty to follow its standards and procedures to appropriately medically screen Plaintiff in the emergency department. On information and belief, Defendant has numerous relevant procedures or policies not yet disclosed.

42.    Defendant HPH's advertised standard on its website is: "Your inability to pay for care should not prevent you from receiving medically necessary services".

43.    Defendant HPH's Standards of Conduct provide in relevant part:

**A.**    "**THE JOINT COMMISSION**

All HPH employees are responsible for adhering to The Joint Commission (TJC)".

Page 5

17

**B.** **"PATIENT CARE**

Compassionately deliver the most appropriate, effective and efficient care to HPH patients. Treat patients with compassion and dignity, with respect for patient rights. All laws governing patients and patient care must be followed.

**Guiding principles**

- All patient care must be appropriate and designed to meet the intended outcomes of the patient care plan. Patients must always be treated with sensitivity, respect and professionalism. Policies and procedures regarding patient rights must be consistently followed."
  Page 5

**C.** **"BUSINESS AND CLINICAL PRACTICES**

Good judgment and high ethical standards are expected in all business and clinical practices."
Page 2

**D.** **"STANDARDS OF CONDUCT**
...
In today's realm of compliance ignorance of what is expected of you is not a defense and is extremely dangerous."
Page 1

**E.** **"PROFESSIONAL RECORDS**

Keep honest and accurate records."

Page 5

44. The Joint Commission's relevant standards are:

A. "Standard COP .1
Uniform care of all patients is provided and follows applicable law and regulations"

18

B.   "Standard AOP. 1.1
Each patient's initial assessment includes an evaluation of physical, psychological, social, and economic factors, including a physical examination and health history."

C.   "Standard AOP 1. 2.1
The initial medical and nursing assessments of emergency patients are based on their needs and conditions"

D.   "Standard AOP .5 .5
All equipment and medical technology used for laboratory testing is regularly inspected, maintained, and calibrated, and appropriate records are maintained for these activities."

E.   "Standard FMS .1
The hospital complies with relevant laws, regulations, and facility inspection requirements."

45.   In committing the EMTALA violations and omissions alleged in this lawsuit, Defendant Hospital violated its own procedures, and Plaintiff suffered disparate injuries treatment as a result. First, Defendant violated its standard that inability to pay for care should not prevent a patient from receiving medically necessary services. See e.g. supra at ¶s 42, 43.A and 44.A.

46.   Defendant violated its policies requiring it to follow EMTALA ("All laws…"). See e.g. supra at ¶s 43.A, 43.B, 44.A and 44.E. By demonstrating ignorance of what is expected of Defendant under EMTALA, Defendant violated

19

its procedures requiring good judgment, high ethical standards, compassionate and appropriate care. See e.g. <u>supra</u> at ¶s 43.A, 43.B, 43.C, 43.D, 44.B and 44.C.

47.    Defendant Hospital violated its polices requiring it to keep honest and professional records. See <u>supra</u> at ¶s 43.E, 44.D and 44.E. Two examples discovered thus far are (1) Defendant's nurse's uncharted assertion to Plaintiff on May 24, 2012 that scans – MRI/CT are usually used for symptoms like Plaintiff's, and (2) failure to chart criticism of Plaintiff's extremely low blood pressure test taken by clinic staff on May 24, 2012.

48.    Other instances and allegations relating to disparate application of Defendant's rules and procedures other than those stemming from Plaintiff's status as an uninsured an unemployed person are set forth elsewhere in this pleading, and are incorporated herein by reference. The following allegations are related to procedures relating to equal treatment regardless of financial condition:

49.    Judicial notice is requested for the following, since the fact of low Medicaid/Medicare hospital reimbursement as well documented:

> "…numerous studies that show that <u>patients on Medicaid</u>, our national government-run health-care program for the poor, <u>do far worse on health outcomes than do those on private insurance</u>, and in some cases, worse than those with *no insurance at all*….
> … …
> … …
> Why does this occur? <u>The main reason is that Medicaid underpays doctors and hospitals to care for Medicaid beneficiaries</u>. Medicaid's reimbursement rates are around half of those paid by private insurers. <u>In</u>

20

many cases, Medicaid pays doctors less than it costs to care for Medicaid patients, meaning that doctors face the choice of caring for the poor, and going broke, or shutting their doors to Medicaid patients." ***Forbes 3/10/12 Article: "New Study: Expanding Medicaid Reduces Access to Health Care"*** (*by Google search: "Medicaid Reduces Access"*). Emphasis added.

Website location: http://www.forbes.com/sites/aroy/2012/03/10/new-study-expanding-medicaid-reduces-access-to-health-care/

50. Defendant Hospital treated Plaintiff differently due to his lack of employment and/or insurance by failure to provide Matthew with a medical screening examination comparable to the one offered to other patients presenting similar symptoms.

51. Defendant Hospital, at all times was acutely aware that if Plaintiff was medically screened appropriately for his obvious symptoms of necrotizing fasciitis (NF), his hospital stay in the HPH system would be from 4 - 6 weeks. During the period, two NF patients from Kauai had lengthy the hospital stays in the HPH system which were longer than 30 days each.

52. In or about 1997, the president of Kauai Medical Group (now part of HPH) claimed there were 22 hospitalizations for NF in October and 14 in November of 1997, and that a similar outbreak occurred after Hurricane Iniki.

53. In December of 1997, 500 Kauai children were tested to see if they carried a strain of necrotizing fasciitis (NF) caused, as in this case, by strep A

bacterial infections. The tests were prompted by increasing admissions at Wilcox

Hospital during the three-month period. The tests were sponsored by the Hawaii

Health Department and the Atlanta Center for Disease Control. Forty-one (41)

children were found positive for NF.

54.     In 2001, Defendant HPH and Wilcox Hospital merged.

55.     During March of 2002, HPH member Wilcox Memorial Hospital

agreed to pay $1.5 million to the United States, in addition to a fine. This was to

settle charges that it overbilled Medicare and Tricare programs, particularly in

pneumonia cases between 1996 and 1998.

56.     During 2006, Defendant HPH recommended that the Department of

Human Services, State of Hawaii rebase all Medicaid and Quest reimbursements

based upon actual current cost for Hawaii hospitals.

57.     The foregoing shows that HPH has a wealth of experience with

necrotizing fasciitis, and its substantial costs; and further, that Defendant takes

significant risks to benefit financially sacrificing of patient safety, and Defendant's

institutional integrity.

## SECOND CLAIM FOR RELIEF – (Alternative) FAILURE TO STABILIZE

58.     Plaintiff realleges the foregoing paragraphs and incorporates them as

though fully set forth herein.

22

59.    Pursuant to 42 USC §1395dd(b), Plaintiff Matthew Leimbach went to Defendant Hospital on May 24, 2012, and requested examination or treatment.

60.    Defendant Hospital's nurse informed Matthew that the Hospital normally used scans, either MRI or CAT scans, for symptoms like his; but the Hospital could not use its scan equipment for him, as the machine was "down". However, Defendant did not attempt to transfer to another facility pursuant to 42 USC §1395dd(b)(1)(B), since its equipment was down.

61.    As alleged above, Defendant Hospital cannot contend it determined that Matthew had an emergency medical condition on May 24, 2012. If so, Defendant violated 42 USC §1395dd(b) by failure to provide further examination and treatment required to stabilize the medical condition, or to transfer Plaintiff to another medical facility.

**THIRD CLAIM FOR RELIEF –    FAILURE TO STABILIZE OR TRANSFER**

62.    Plaintiff realleges the foregoing paragraphs and incorporates them as though fully set forth herein.

63.    Pursuant to 42 USC §1395dd(b), Plaintiff Matthew Leimbach went to Defendant Hospital on May 27, 2012, and requested examination and treatment. Plaintiff was determined by Defendant to have an emergency medical condition. However, Defendant violated 42 USC §1395dd(b) by failure to provide further

23

examination and treatment required to stabilize the medical condition, or to transfer Plaintiff to another medical facility.

64.     Two hours after Plaintiff was admitted to HPH Defendants' ED on Sunday, May 27, 2012, his labs returned. Therein, Plaintiff Matthew Leimbach was positive for systemic inflammatory response syndrome (SIRS) and suffering from sepsis. HPH Defendant's ED staff failed to stabilize Matthew's NF as a surgical emergency with high mortality, and instead used more laboratory tests at a glacial pace to delay stabilization.

65.     Stabilization was denied because Defendant Hospital's pretextual, cost-conscious examinations failed to provide stabilizing treatment (or transfer to another facility) for just some of Matthew's cumulative, and by now extremely obvious symptoms of necrotizing fasciitis (NF), as follows:

    (1)    8/10 pain in left foot with extreme tenderness;

    (2)    SIRS indicating sepsis;

    (3)    Very high temperature (fever) (am 104.36) (SIRS criteria #1);

    (4)    Flu-like symptoms: vomiting, fever, pain, weakness;

    (5)    Heart rate was 105 (SIRS criteria #2);

    (6)    lack of respiratory symptoms;

    (7)    High white blood cell count (SIRS criteria #4) (SIRS criteria more than satisfied);

    (8)    low sodium;

    (9)    Failing Platelets and Bandemia;

24

(10)   Hypotension;

(11)   Volume depletion;

(12)   "early sepsis" (merely pondered);

(13)   edema;

(14)   ecchymosis – ankle & foot (left);

(15)   erythema – midshin (left);

(16)   "evidence" of infectious etiology;

(17)   blood in urine.

66.   On 5/27/12, Defendant failed to provide necessary stabilizing treatment for emergency conditions which indicated NF, including (A) sepsis raging painfully through Mr. Leimbach's left leg; (B) high temperature, (C) evidence of trauma, laceration/abrasions or mosquito bites at body site, (D) hypotension (low blood pressure), (E) fever and flu like symptoms coupled by a lack of history of close contacts with influenza – like illness, (F) focal pain at left foot, (G) history of blunt trauma at site in 40% of the patients, (H) elevated WBC, and (I) low sodium.

67.   By 11:02 p.m. on May 27, 2012, after wasting nearly two hours in the ED, Defendant's staff ascertained that Plaintiff's pulse and blood pressure were abnormal. He reported constant pain at 9 on a scale of 10 in his left ankle. His temperature was 99°F.

68.     From 9:10 p.m. 5/27/12 to 1:12 p.m. 5/28/12, Plaintiff was not admitted to Defendant Wilcox Hospital. He was left in the emergency room until May 28, 2012 at 13:12 (1:12 p.m.). It is not certain when afterward he was admitted to Defendant's hospital. Stabilizing treatment required an MRI and immediate surgical intervention. At 3:40 a.m. on 5/28/12, an incomplete set of Labs was returned. At an unknown time during the morning of 5/28/12, Plaintiff Leimbach's temperature had been recorded as averaging 101.3°F. His white blood cell count was elevated (14.2). After failing to consult with an infectious disease specialist, or stabilize Plaintiff, order a biopsy and MRI, Defendant finally got around to "recommending" a CT scan and an orthopedic surgery consultation.

69.     Despite risk factors and symptoms for NF, Defendant proceeded too slowly to provide treatment to stabilize the rapidly spreading infection. NF requires immediate surgical intervention and broad spectrum antibiotics. Even an MRI and biopsy are not meant to slow down surgical therapy:

> "Research supports that the most important predictor of morbidity and mortality in this severe life threatening infection is the time interval between the onset of symptoms and definitive surgical therapy. Necrotizing fasciitis is a progressive, rapidly spreading inflammatory infection located in the deep fascia, causing secondary necrosis of the subcutaneous tissues. For treatment of necrotizing fasciitis to be successful, this condition must be diagnosed early on with administration of broad-spectrum antibiotics and rapid surgical debridement of the

<u>involved area. Once necrotizing fasciitis is suspected</u> as **[**33]** being present, the patient should be immediately taken to the operating room to open up the surgical wound and debride the infected tissue." 255 S.W.3d 665 pg 678. Emphasis added.

70.     Instead of complying with the stabilizing requirement at 42 USC §1395dd(b) for a rapidly spreading bacterial, infection, Defendants staff avoided further curiosity until about 6:37 a.m. on May 28, 2012 when a CBC test showed that Matthew Leimbach's bands and platelets were low.

71.     When Defendant's hospitalist showed up for work later that morning, she noted discoloration, blister formation and increased swelling. Plaintiff appeared clearly septic. While mildly concerned about necrotizing fasciitis, the hospitalist ignored the need for rapid surgical intervention to stabilize Plaintiff, and the requirement to transfer him. Defendant's staff also ignored the fact that NF damages nerves, reducing the pain at the infection site. Stabilization was withheld because Defendant's staff could not find "out of proportion pain".

72.     Instead of providing necessary stabilizing treatment, a High Priority chart note was entered, stating in part as follows: "Brought to OR by Dr. Miyashiro yesterday with findings of purulent drainage from leg, fascia looked intact, small amounts of necrotic muscle. Possible very early necrotizing fasciitis. Cultures growing Group A Strep." The culture was ordered according to the chart, at 12:43

p.m. on May 28, 2012. This procedure negligently caused further delay to stabilization and necessary transfer.

73. On May 28, 2012 at 10:35 p.m., Defendant's general surgeon, obtained a consent for treatment from Matthew for the following: "condition(s) in professional and lay language: PROFESSIONAL: cellulitis of left leg, possible abscess, possible fasciitis." Fasciitis alone is coded 729.4, ICD-9, and excludes necrotizing fasciitis, coded 728.86. Defendant's Hospitalist also informed Matthew that he did not have NF, after the 5/28/12 tests.

74. After surgery, on or about May 28, 2012 Matthew was seen by Defendant's staff who were tasked with the efficient use of hospital and healthcare resources. At that point, Defendant's Hospitalist assured Matthew that he did not have necrotizing fasciitis. Defendant failed to adhere to the dire need for stabilizing treatment, notwithstanding the most crucial predictor of morbidity and mortality for aggressive Group A Strep and NF, which is the time interval between the onset of symptoms (before the 5/24/12 ED visit) and definitive surgical therapy. Defendant's staff should have performed surgery much sooner as is required to stabilize aggressive Group A Strep and/or NF.

75. Defendant's staff failed to stabilize and treat Matthew by refusing to call in an infectious disease specialist until about noon on May 29, 2012 – five

28

days too late. Defendant's specialist ordered a change in antibiotics and recommended further surgery. Stabilization of NF required much more haste.

76.    Defendant's staff did not promptly stabilize and treat Matthew for necrotizing fasciitis, or any highly invasive Group A Strep infection, and his condition was rapidly getting worse. His family arranged for transport on May 31, 2012 by Medevac to Queen's Hospital, over objection and stalling by Defendant's administrators identified herein as DOES 140-150.

77.    At Queen's Medical Center, the team diagnosed Matthew with necrotizing fasciitis and treated it with surgeries and other procedures. Plaintiff was released from Queen's on about June 19, 2012.

## FOURTH CLAIM FOR RELIEF – DECLARATORY JUDGMENT (28 USC §2201)

78.    Plaintiff realleges the foregoing paragraphs and incorporates them as though fully set forth herein.

79.    HRS §671-1 (2013) includes as its definition of a "medical tort" "an error or omission in professional practice by a health care provider, which proximately causes death, injury or other damage to a patient."

80.    HRS §671-12 provides in part: "**(a)** Any person or the person's representative having concerns regarding the existence of a medical tort shall submit an inquiry to the medical inquiry and conciliation panel before a suit based

on the circumstances of the inquiry may be commenced in any court of this State. Inquiries shall be submitted to the medical inquiry and conciliation panel in writing and shall include the facts upon which the inquiry is based and the names of all parties against whom the inquiry is or may be made who are then known to the person or the person's representative."

81.     HRS §671-18 provides: "The filing of the inquiry with the medical inquiry and conciliation panel or with an approved or agreed upon alternative dispute resolution provider shall toll any applicable statute of limitations, and the statute of limitations shall remain tolled until sixty days after the termination of the panel or the notification of completion from the approved or agreed upon alternative dispute resolution provider is mailed or delivered to the parties. If panel proceedings are not completed within twelve months, or the alternative dispute resolution process is not completed within twelve months, the statute of limitations shall resume running and the party filing the inquiry may commence a suit based on the circumstances related to the inquiry in any appropriate court of this State. The panel or the approved or agreed upon alternative dispute resolution provider shall notify all parties in writing of this provision."

82.     Based upon the foregoing incorporated claims, the adversarial relationship between the parties has sufficiently crystalized as to permit the Court to render declaratory judgment.

83.     Because HRS §671-18 tolls certain relevant statutes of limitations, the statute's requirements are not properly incorporated into the EMTALA. Indeed, a U.S. District Court observed in <u>Sanders v. Palomar Med Ctr.</u>, 2010 U.S. Dist. 65120 (S.D. Ca 2010) *13: "The Ninth and Second Circuits however, have held that where a state notice statute merely requires a plaintiff to file a notice of claim before commencing a civil action, <u>and does not</u> provide for tolling, the state's requirements may actually be incorporated into EMTALA." (Emphasis added, footnotes omitted).

84.     An actual and substantial controversy exists between the parties regarding whether EMTALA claims are cognizable in the Hawaii MICP.

**WHEREFORE,** Plaintiff demands judgment against Defendant as follows:

a.      For general and special damages in amounts that will be proven at trial; and Plaintiff further states that the amount of his damages as asserted herein falls within the jurisdictional requirements of this honorable Court.

b.      Punitive damages;

c.      Interest as allowed by law;

d.      For declaratory judgment that Hawaii's MICP excludes claims brought pursuant to the EMTALA;

e.      Plaintiff's costs of suit; and

f.      Such other and further relief as this Court deems just and proper.

DATED:     Honolulu, Hawaii, April 1, 2015.


/s/ *STEPHEN M. SHAW*
_____
PAUL H. SACCOCCIO
STEPHEN M. SHAW
Attorneys for Plaintiff
MATTHEW R. LEIMBACH

32

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| MATTHEW R. LEIMBACH, | ) | CIVIL NO.  14-00246 JMS-RLP |
| | ) | (EMTALA) |
| Plaintiff, | ) | |
| | ) | |
| | ) | JURY DEMAND |
| vs. | ) | |
| | ) | |
| HAWAII PACIFIC HEALTH, | ) | |
| WILCOX MEMORIAL HOSPITAL, | ) | |
| KAUAI MEDICAL CLINIC, | ) | |
| WILCOX HEALTH SYSTEM, | ) | |
| and DOES 1-150, | ) | |
| | ) | |
| Defendants. | ) | |

## **JURY DEMAND**

Plaintiff demands a jury trial on all of the claims in this lawsuit.

DATED:     Honolulu, Hawaii, April 1, 2015.


*/s/ **STEPHEN M. SHAW***
_____
PAUL H. SACCOCCIO
STEPHEN M. SHAW
Attorneys for Plaintiff
MATTHEW R. LEIMBACH

1