IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| MATTHEW R. LEIMBACH, | ) | CIV. NO. 14-00246 JMS-RLP |
| | ) | |
| Plaintiff, | ) | ORDER GRANTING DEFENDANTS' |
| | ) | MOTION TO DISMISS COMPLAINT, |
| vs. | ) | DOC. NO. 31 |
| | ) | |
| HAWAII PACIFIC HEALTH, | ) | |
| WILCOX MEMORIAL HOSPITAL, | ) | |
| KAUAI MEDICAL CLINIC, | ) | |
| WILCOX HEALTH SYSTEM, and | ) | |
| DOES 1-150, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS COMPLAINT, DOC. NO. 31

## I. INTRODUCTION

Plaintiff Matthew R. Leimbach ("Plaintiff") brings this action against

Defendants Hawaii Pacific Health ("HPH"), Wilcox Memorial Hospital ("WMH"),

Kauai Medical Clinic ("KMC"), and Wilcox Health System ("WHS")

(collectively, "Defendants"), alleging that they provided inappropriate, disparate,

and cursory care in treating what was ultimately determined to be necrotizing

fasciitis in Plaintiff's left foot. Plaintiff's First Amended Complaint ("FAC")

asserts claims for violation of the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd(a) & (b).[1]

Currently before the court is Defendants' Motion to Dismiss, arguing that Plaintiff has failed to allege sufficient facts to support a plausible EMTALA violation. For the reasons set forth below, the motion is GRANTED with leave to amend.

## II. BACKGROUND

### A. Factual Background

#### 1. Judicial Notice of Admission Records

In outlining the factual allegations of the FAC, the court must first address a threshold issue raised by the parties -- whether the court may take judicial notice of Plaintiff's medical records, which document the emergency room visits that are the basis of his claims, and which Defendants present with their Motion. *See* Doc. Nos. 31-5, 31-6, Defs.' Exs. B, C.

If a court considers evidence outside the pleadings when ruling on a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss, "it must normally

---

[1] The FAC also seeks a declaratory judgment that Plaintiff's EMTALA claims are not subject to the medical inquiry and conciliation panel process outlined in Hawaii Revised Statutes § 671-12(a). At the June 29, 2015 hearing, the parties agreed that this claim is moot, and the court therefore dismisses it without leave to amend.

2

convert the 12(b)(6) motion into a Rule 56 motion for summary judgment."

*United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003) (citations omitted).

However, a court may consider "documents incorporated by reference in the

complaint . . . without converting the motion to dismiss into a motion for summary

judgment." *Id.* at 908 (citations omitted). A document may be incorporated by

reference if (1) "the plaintiff refers extensively to the document," or (2) "the

document forms the basis of the plaintiff's claim." *Id.* (citations omitted). The

court may treat the document as part of the complaint and assume its contents are

true for the purposes of a Rule 12(b)(6) motion, even if the defendant offers the

document. *Id.*

　　　　Although not attached to the FAC, Plaintiff refers to his medical

records extensively, quoting them at length in several paragraphs of the FAC. *See*

Doc. No. 21, FAC ¶¶ 10, 13, 27-28, 65, 72-73. The FAC also asserts that the

medical records are "incomplete and misleading," *id.* ¶ 13, and Plaintiff bases his

claims, in part, on the allegation that Defendants failed to include specific

information in the records. *Id.* ¶ 47. Given the FAC's extensive reference to the

medical records, the court finds that they may be treated as part of the FAC. *See*

*Ritchie*, 342 F.3d at 908.

In opposition, Plaintiff argues that the admission records and medical terms used in them "are not matters of common knowledge within the experience of non-experts," and statements contained in the record are "required to be made by an expert witness." Doc. No. 51, Pl.'s Opp'n at 6 (citations omitted). The court rejects this argument -- the records simply provide additional details of Plaintiff's treatment, and at the Motion to Dismiss stage, no expert testimony is needed.

The court therefore proceeds to outline the facts based on the allegations of the FAC and Plaintiff's May 24 and 27, 2012 medical records.

### 2. *Plaintiff's May 24, 2012 Treatment*

In May of 2012, Plaintiff sustained mosquito bites and lacerations to his left foot during a three-week trip to Indonesia. Doc. No. 21, FAC ¶ 7. On May 23, the day after Plaintiff returned to Kauai, he hurt, but did not cut, his left foot while exiting a truck. *Id.*

On May 24, 2012, Plaintiff visited Defendants' outpatient clinic, presenting the following symptoms to clinic staff: acute and increasing pain to his left foot, severe swelling and discoloration in his left foot, shortness of breath, a bitter taste in his mouth, and severe and acute flu-like symptoms, including body aches, headaches, nausea, dehydration, pain, and vomiting. *Id.* ¶ 8; *see also* Doc.

No. 31-5, Defs.' Ex. B at W000004.  Plaintiff informed clinic staff that he had no

job or health insurance.  Doc. No. 21, FAC ¶ 9.  Clinic staff recorded Plaintiff's

temperature as 100.2° F and his blood pressure as 81/38, then informed him that

his blood pressure was too low for clinic services.  *Id.*  As a result, Plaintiff was

taken and admitted to Defendants' emergency room ("ER").  *Id.*

At the ER, laboratory diagnostics were performed, resulting in a

diagnostic impression of "Viral infection.  Sprain of ankle."  *Id.* ¶ 13; *see also*

Doc. No. 31-5, Defs.' Ex. B at W000008.  The FAC asserts that one of

Defendants' nurses told Plaintiff that WMH patients with symptoms such as his

are usually given MRI or CT scans, Doc. No. 21, FAC ¶ 14, but that "the hospital

could not use its scan equipment for him, as the machine was 'down.'"  *Id*. ¶ 60.

Defendants did not attempt to transfer Plaintiff to another facility for this

screening, *id.*, and as a result, Plaintiff was not given an MRI or CT scan on May

24, 2012.  *Id.* ¶ 14.

Plaintiff was released from the ER that day, and was advised to "use

Tylenol or ibuprofen [for his fever] . . . stay hydrated and get plenty of bed rest.

Follow up in the urgent care clinic next week . . . [use] crutches and keep [his] leg

elevated."  Doc. No. 31-5, Defs.' Ex. B at W000014.

### 3. *Plaintiff's May 27-31, 2012 Treatment*

From May 25 to May 27, 2012, Plaintiff's temperature did not drop below 100° F, and frequently reached temperatures as high as 104° F. Doc. No. 21, FAC ¶ 26. When Plaintiff called Defendants' ER, he was told to take ibuprofen. *Id.* This call was not charted in his file or otherwise recorded. *Id.*

On May 27, 2012 at about 9:10 p.m., Plaintiff was admitted to Defendants' ER a second time (where his forms again referred to "MED QUEST"), and remained there overnight. *Id.* ¶ 27. Plaintiff presented many of the same symptoms as at his first visit, in addition to a high white blood cell count, bandemia, failing platelets, hypotension, and blood volume depletion. *Id.* ¶ 28; *see also* Doc. No. 31-6, Defs.' Ex. C at W000025. A chart note stated that his symptoms suggested "early sepsis." Doc. No. 21, FAC ¶ 28; Doc. No. 31-6, Defs.' Ex. C at W000025.

Two hours after his admission, Plaintiff's lab results revealed that he was positive for systemic inflammatory response syndrome (SIRS) and was suffering from sepsis. Doc. No. 21, FAC ¶ 64. Hospital staff also ascertained that Plaintiff's blood pressure and pulse were abnormal, and Plaintiff reported constant pain in his ankle at a pain level of 9 on a scale of 10. *Id.* ¶ 67. Plaintiff was not diagnosed or stabilized for necrotizing fasciitis -- which is "a progressive, rapidly

spreading inflammatory infection located in the deep fascia, causing secondary necrosis of the subcutaneous tissues," and which requires early identification, administration of broad-spectrum antibiotics, and rapid surgical debridement. *Id.* ¶ 20. Instead, Defendants ran more tests. *Id.* ¶ 64.

At some time in the morning of May 28, 2012, hospital staff recorded that Plaintiff's white blood cell count was elevated and his average temperature was 101.3° F. *Id.* ¶ 68. At 6:37 a.m. on May 28, 2012, a "CBC test" showed that Plaintiff's "bands and platelets were low," and at some point, "Defendant finally got around to 'recommending' a CT scan and an orthopedic surgery consultation." *Id.* One of Defendants' hospitalists noted discoloration, blister formation, and increased swelling of Plaintiff's left foot. *Id.* ¶ 71. Although the hospitalist was "mildly concerned about necrotizing fasciitis, the hospitalist ignored the need for rapid surgical intervention" or the need to transfer Plaintiff, and instead ordered a culture for "Group A Strep." *Id.* ¶¶ 71-72; *see also* Doc. No. 31-6, Defs.' Ex. C at W000025.

Plaintiff was admitted to WMH some time after 1:12 p.m. on May 28, 2012. Doc. No. 21, FAC ¶ 68. At 10:35 p.m. that evening, Plaintiff gave consent for Defendants' general surgeon to perform treatment for "cellulitis of left leg, possible abscess, possible fasciitis." *Id.* ¶ 73. Plaintiff was not, however, treated

for necrotizing fasciitis, and Defendants' hospitalist told him that he did not have necrotizing fasciitis after the surgery. *Id.* ¶ 74.

At about noon on May 29, 2012, Defendants called an infectious disease specialist to examine Plaintiff. *Id.* ¶ 75. The specialist eventually ordered a change in antibiotics and recommended further surgery. *Id.*

On May 31, 2012, Plaintiff's family arranged for his transport to Queen's Medical Center ("QMC") on Oahu, and Plaintiff was transferred that day, "over objection and stalling by Defendant's administrators . . . ." *Id.* ¶ 76. When Plaintiff arrived at QMC, he was given an MRI scan and diagnosed with necrotizing fasciitis, which was treated with surgeries and other procedures. *Id.* ¶¶ 23, 77.

## B.    Procedural Background

On May 23, 2014 Plaintiff filed his Complaint against Defendants asserting violations of EMTALA § 1395dd(a) & (b) and seeking declaratory judgment under 28 U.S.C. § 2201. Doc. No. 1. After Defendants filed a Motion to Dismiss, Plaintiff filed his FAC on April 1, 2015. Doc. No. 21.

On April 16, 2015, Defendants filed their Motion to Dismiss. Doc.

No. 31. Plaintiff filed an Opposition on June 1, 2015.[2] Doc. No. 51. Defendants

filed a Reply on June 8, 2015, Doc. No. 52. On June 29, 2015, the court heard oral

arguments on the Motion. Doc. No. 54.

### III.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) permits a motion to dismiss

a claim for "failure to state a claim upon which relief can be granted[.]" A Rule

12(b)(6) dismissal is proper when there is either a "'lack of a cognizable legal

theory or the absence of sufficient facts alleged.'" *UMG Recordings, Inc. v.*

*Shelter Capital Partners, LLC*, 718 F.3d 1006, 1014 (9th Cir. 2013) (quoting

*Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)).

Although a plaintiff need not identify the legal theories that are the

basis of a pleading, *see Johnson v. City of Shelby, Mississippi*, 135 S. Ct. 346, 346

(2014) (per curiam), a plaintiff must nonetheless allege "sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550

---

[2] In his Opposition, Plaintiff requested leave to file a supplemental brief or surreply to address what he viewed as Defendants' misleading and deceptive summarization of the allegations of the FAC. Doc. No. 51, Pl.'s Opp'n at 7. Plaintiff also requested sanctions. *Id.* at 8. The court denies both requests -- the court is perfectly capable of reading the FAC, and no sanctions are warranted.

U.S. 544, 570 (2007)); *see also Weber v. Dep't of Veterans Affairs*, 521 F.3d 1061, 1065 (9th Cir. 2008). This tenet -- that the court must accept as true all of the allegations contained in the complaint -- "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. Accordingly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555); *see also Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) ("[A]llegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively.").

Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). In other words, "the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. Factual allegations that only permit the court to infer "the mere possibility of misconduct" do not show that the pleader is entitled to relief as required by Rule 8. *Iqbal*, 556 U.S. at 679.

# IV. DISCUSSION

Defendants argue that Plaintiff has failed to allege a plausible claim for violation of EMTALA. The court first outlines the legal framework for EMTALA claims, and then addresses the allegations of the FAC.

## A. Legal Framework

"Congress enacted EMTALA to ensure that individuals, regardless of their ability to pay, receive adequate emergency medical care." *Bryant v. Adventist Health Sys./W.*, 289 F.3d 1162, 1165 (9th Cir. 2002) (quoting *Jackson v. E. Bay Hosp.*, 246 F.3d 1248, 1254 (9th Cir. 2001)). In particular, "Congress was concerned that hospitals were 'dumping' patients who were unable to pay, by either refusing to provide emergency medical treatment or transferring patients before their conditions were stabilized." *Id.* (quoting *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1255 (9th Cir. 1995)). EMTALA therefore imposes two specific duties on a hospital -- the duty to provide "an appropriate medical screening examination," *see* 42 U.S.C. § 1395dd(a), and the duty to "stabilize" any emergency medical conditions detected by the medical staff before transferring or discharging the patient. *Id.* § 1395dd(b).

These two duties are limited -- EMTALA "was not enacted to establish a federal medical malpractice cause of action nor to establish a national

standard of care." *Bryant*, 289 F.3d at 1166 (citing *Baker v. Adventist Health, Inc.*, 260 F.3d 987, 993 (9th Cir. 2001)). Rather, "Congress enacted the EMTALA not to improve the overall standard of medical care, but to ensure that hospitals do not refuse essential emergency care because of a patient's inability to pay." *Eberhardt*, 62 F.3d at 1258 (citing H.R. Rep. No. 241, 99th Cong., 1st Sess. (1986), *reprinted in* 1986 U.S.C.C.A.N. 726-27). EMTALA therefore creates "a new cause of action, generally unavailable under state tort law, for what amounts to failure to treat and not to duplicate preexisting legal protections." *Bryant*, 289 F.3d at 1168-69 (citation and quotations omitted). As a result, "[a]n individual who receives substandard medical care may pursue medical malpractice remedies under state law," but a tort claim based on substandard care, alone, is not an EMTALA violation. *Id.* at 1166.

As to the duty to provide an appropriate medical screening, EMTALA provides that "[i]f an individual seeks emergency care from a hospital with an emergency room and if that hospital participates in the Medicare program, then 'the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department . . . to determine whether or not an emergency medical condition . . . exists.'" *Id.* at 1165 (quoting

42 U.S.C. § 1395dd(a)). A hospital meets its obligation to provide an "appropriate

medical screening" if it:

> provides a patient with an examination comparable to the
> one offered to other patients presenting similar
> symptoms, unless the examination is so cursory that it is
> "not designed to identify acute and severe symptoms that
> alert the physician of the need for immediate medical
> attention to prevent serious bodily injury."

*Baker*, 260 F.3d at 995; *see also Jackson*, 246 F.3d at 1256; *Eberhardt*, 62 F.3d at

1257-59.

Thus, an individual may establish an inappropriate screening claim by

showing that a hospital failed to provide a screening that is comparable to one

offered to other patients presenting similar symptoms, or by showing that the

examination was so cursory that it was not "designed to identify acute and severe

symptoms that alert [physicians] of the need for immediate medical attention[.]"

*Jackson*, 246 F.3d at 1256 (citation omitted); *see also Eberhardt*, 62 F.3d at 1258

("[A] hospital can[not] discharge its duty under the EMTALA by not providing

any screening, or by providing screening at such a minimal level that it properly

cannot be said that the screening is 'appropriate.'") (emphasis omitted).

Additionally, "[e]vidence that a hospital did not follow its own screening

procedures can support a finding of EMTALA liability for disparate treatment."

*Baker*, 260 F.3d at 995 (quoting *Battle v. Mem. Hosp.*, 228 F.3d 544, 558 (5th Cir.

2000)); *see also Repp v. Anadarko Mun. Hosp.*, 43 F.3d 519, 523 (10th Cir. 1994)

(noting that "slight deviation[s]" or "*de minimus* variations" from a hospital's

standard screening policy "do not amount to a violation of hospital policy," and do

not violate EMTALA).

   "This standard [for appropriate screening] is consistent with

Congress's purpose in enacting EMTALA, which was to limit the ability of

hospitals to avoid treating poor or uninsured patients," *Jackson*, 246 F.3d at 1256,

and addresses the scenario where a hospital "intentionally fail[s] to diagnose an

emergency medical condition in order to avoid EMTALA's stabilization

requirement." *Bryant*, 289 F.3d at 1166 n.3. The overall test for appropriate

screening is whether the screening procedure "is designed to identify an

'emergency medical condition,' that is manifested by 'acute" and 'severe'

symptoms," not "whether the procedure was adequate as judged by the medical

profession." *Eberhardt*, 62 F.3d at 1258. Indeed, EMTALA does not provide

redress for negligent diagnosis by a hospital or physician, as a medical malpractice

claim might, *Bryant*, 289 F.3d at 1166 (collecting cases), and negligent or faulty

screening is not enough to violate EMTALA. *Jackson*, 246 F.3d at 1256

(collecting cases).

As to the duty to "stabilize," EMTALA provides that where "the hospital's medical staff determines that there is an emergency medical condition, then . . . the staff must 'stabilize' the patient before transferring or discharging the patient." *Bryant*, 289 F.3d at 1165 (citing 42 U.S.C. § 1395dd(b)(1); *Baker*, 260 F.3d at 992). EMTALA defines "to stabilize" as "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility[.]" 42 U.S.C. § 1395dd(e)(3)(A). Transfer includes both discharge and movement to another facility. *Id*. § 1395dd(e)(4).

The duty to stabilize extends to "only those emergency medical conditions that its staff detects," such that "a hospital does not violate EMTALA if it fails to detect or if it misdiagnoses an emergency condition." *Bryant*, 289 F.3d at 1166; *Baker*, 260 F.3d at 993-94. Further, "EMTALA's stabilization requirement ends when an individual is admitted for inpatient care" and the statute generally ceases to apply once the patient is admitted to the hospital. *Bryant*, 289 F.3d at 1168. From that point forward, "state tort law provides a remedy for negligent care." *Id.* at 1169.

**B.     Analysis**

In 84 paragraphs spanning 31 pages, the FAC asserts claims based on both inappropriate screening and failure to stabilize and/or transfer.  Despite the FAC's length, much of it simply parrots the basic contours of inappropriate screening and failure to stabilize and/or transfer claims.

For example, as to Plaintiff's inappropriate screening claims, the FAC asserts that the screening examinations provided by the ER on May 24 and 27, 2012 were not appropriate because they were "not designed to identify the acute and severe symptoms presented as to alert the Emergency Department staff of the need for immediate medical attention to prevent the serious bodily injury which resulted" from Plaintiff's necrotizing fasciitis.  Doc. No. 21, FAC ¶ 12; *see also id.* ¶¶ 24, 28, 37.  The FAC also alleges that "Defendant hospital provided a medical screening examination that was not comparable to other patients with similar symptoms, and [Plaintiff] was provided a screening materially different than other patients similarly situated."  *Id.* ¶ 14; *see also id.* ¶ 29.

With respect to Plaintiff's stabilization and/or transfer claims, the FAC further asserts that "Defendant Hospital cannot contend it determined that [Plaintiff] had an emergency medical condition . . .  If so, Defendant violated 42 U.S.C. § 1395dd(b) by failure to provide further examination and treatment

required to stabilize the medical condition, or to transfer Plaintiff to another medical facility." *Id.* ¶ 61; *see also id.* ¶ 63. The FAC also asserts that "[s]tabilization was denied because Defendant Hospital's pretextual, cost-conscious examinations failed to provide stabilizing treatment (or transfer to another facility) for just some of [Plaintiff's] cumulative, and . . . extremely obvious symptoms of necrotizing fasciitis[.]" *Id.* ¶ 65; *see also id.* ¶ 28.

These conclusory statements and recitations of EMTALA's prohibitions are insufficient to allege a plausible claim. *See Iqbal*, 556 U.S. at 678; *see also Somers v. Apple, Inc.*, 729 F.3d 953, 959-60 (9th Cir. 2013) (holding that plausibility requires the pleading of facts, not conclusory allegations or a formalistic recitation of the cause of action's elements). The court therefore sets aside the FAC's many conclusory assertions and recitations of elements, and analyzes whether the *factual* allegations assert a plausible violation of EMTALA under any theory.

### 1. *Inappropriate Screening*

Based on the following, the court finds that Plaintiff has failed to allege a plausible inappropriate screening EMTALA claim based on cursory examination, disparate treatment, or failure to follow procedures.

### a.   *Cursory examination*

The FAC asserts that Defendants provided Plaintiff a cursory examination, as shown by (1) Defendants' failure to diagnose his necrotizing fasciitis, and (2) Defendants' failure to provide him with several specific screening and treatment procedures.  Doc. No. 21, FAC ¶¶ 13-14, 20, 23.  The court finds these allegations fail to allege a plausible EMTALA violation.

As to his failure to diagnose allegation, the FAC asserts that during both his May 24 and 27, 2012 ER visits, Plaintiff met the relevant criteria for necrotizing fasciitis, and the fact that Defendants did not properly diagnose his necrotizing fasciitis "demonstrate[s] that the medical screening by Defendant's [ER] . . . was not appropriate."[3]  *Id.* ¶¶ 12-13; *see also id.* ¶ 28.  These allegations, however, do not assert a plausible EMTALA claim -- Defendants cannot incur EMTALA liability for what is merely an incorrect diagnosis.  *See Bryant*, 289 F.3d at 1166.  Rather, an EMTALA claim based on cursory screening requires Plaintiff to allege facts establishing that Defendants failed "to identify acute and severe

---

[3]  The FAC asserts that the relevant criteria for necrotizing fasciitis, met by Plaintiff, includes high temperature, evidence of trauma, laceration/abrasions or mosquito bites at body site, hypotension, fever, dehydration and flu-like symptoms, local pain and swelling, elevated white blood count, and low sodium.  Doc. No. 21, FAC ¶ 12.

*symptoms . . .* [to] alert [physicians] of the need for immediate medical attention."

*Eberhardt*, 62 F.3d at 1257 (emphasis omitted and added).

As to the specific screening procedures Plaintiff asserts he should

have been provided, the FAC asserts that:

> [Defendants] treated Plaintiff differently by withholding
> key procedures used with other patients to identify acute
> and serve [sic] symptoms of necrotizing fasciitis,
> including, without limit, a diagnostic incision to search
> for infection, ultrasound of the left foot near the
> laceration site, as well as other scans, including an MRI
> . . . or CT.

Doc. No. 21, FAC ¶ 23. These allegations are insufficient to state an appropriate

screening claim under EMTALA.

To the extent that Plaintiff asserts an MRI scan was necessary to

provide him with appropriate medical screening, the FAC states that an MRI scan

would have "permitted the visualization of tissue edema in the fasciitis planes for

localization of necrotic tissue and fluid accumulation." *Id.* ¶ 23. That is, had an

MRI machine been available, it could have identified tissue edema, necrosis, and

fluid accumulation, *id.*, -- *i.e.* "acute and severe symptoms that alert [physicians]

of the need for immediate medical attention." *Eberhardt*, 62 F.3d at 1257

(emphasis omitted). The FAC also asserts, however, that a nurse told Plaintiff that

the MRI machines were "down." Doc. No. 21, FAC ¶ 60. As a result, providing

Plaintiff with an MRI was not within the hospital's capability, and Defendants cannot be liable for failing to administer medical screening that was physically beyond their ability. *See* 42 U.S.C. § 1395dd(a) ("[A] hospital must provide for an appropriate medical screening examination *within the capability* of the hospital's emergency department.") (emphasis added); *see also Baker*, 260 F.3d at 995 ("EMTALA explicitly recognizes the differences among the capabilities of hospital emergency rooms, so the statute limits the screening required to one that is within the capability of a given emergency department.").

With respect to the diagnostic incision and ultrasound procedures, the FAC is silent as to what acute and severe symptoms these procedures could have revealed. Without such allegations, the FAC fails to provide a plausible basis to support the inference that these procedures were necessary to identify the severe and acute symptoms of necrotizing fasciitis. *See Eberhardt*, 62 F.3d at 1257. In other words, merely reciting that Defendants should have performed these procedures, without any explanation of what these procedures would have revealed, fails to allege a plausible EMTALA claim.

In opposition, Plaintiff asserts that "[t]he emergency screening examination required on May 24, 2012 was: MRI/CT scans, broad-spectrum antibiotics biopsy [sic], and/or rapid surgically [sic] debridement of the involved

area." Doc. No. 51, Pl.'s Opp'n at 21. The FAC does not include this allegation, and in any event, this argument conflates screening with treatment.[4] As described above, the MRI was unavailable. Further, the FAC identifies the use of broad-spectrum antibiotics and surgical debridement as *treatment* necessary to stabilize necrotizing fasciitis, Doc. No. 21, FAC ¶¶ 20, 69, not as *screening* procedures necessary to identify its acute and severe symptoms. And, once again, although failing to provide this kind of treatment *may* support a state law tort claim, it is not enough to state an EMTALA violation. *See Bryant*, 289 F.3d at 1168-69. As a result, Plaintiff cannot rest his cursory screening claim on Defendants' failure to administer these procedures.

In sum, the court finds that the FAC fails to allege a plausible EMTALA claim based on cursory screening. In making this determination, the court recognizes that EMTALA creates a limited cause of action and places a burden on Plaintiff to identify the symptoms that different screening procedures would have found and that would have alerted Defendants to the need for immediate medical attention to prevent serious bodily injury. *See Eberhardt*, 62

---

[4] In his Opposition, Plaintiff also appears to raise a new claim that the delay in providing specific screening methods, including an MRI scan, amounts to a failure to screen under § 1395dd(a). Doc. No. 51, Pl.'s Opp'n at 20-21. The FAC, however, does not assert such a claim.

F.3d at 1257.  And such allegations may not be within the general knowledge of Plaintiff, raising the possible need for expert input, even at this pleading stage. But these allegations are nonetheless necessary to take this claim outside the realm of state malpractice law and bring it within an EMTALA cursory screening claim.

The court therefore GRANTS Defendants' Motion to Dismiss Plaintiff's EMTALA claim based on cursory screening, with leave to amend.

> b.    *Disparate treatment*

The FAC provides four examples of WMH patients who were properly diagnosed with necrotizing fasciitis, who Plaintiff asserts had similar symptoms to him.  Doc. No. 21, FAC ¶¶ 15-18.  The FAC asserts that unlike Plaintiff, these patients "were provided appropriate screening in that the examination was designed to <u>identify</u> the acute and severe symptoms presented." *Id.* ¶ 19.  The FAC alleges that one of the patients received an MRI after transfer to another hospital and three of the patients experienced a couple of Plaintiff's many symptoms.  *Compare id.* ¶¶ 8, 13, 23, 28, *with id.* ¶¶ 15-18.  The FAC does not describe any symptoms of the fourth patient.  *Id.* ¶ 16.

These allegations fail to support the plausible inference that Plaintiff and these four patients had similar symptoms, let alone that Plaintiff's screening examination was in any way different.  Indeed, the only identified similarity

between the patients and Plaintiff is the fact that they were all ultimately diagnosed with necrotizing fasciitis after first seeking treatment at WMH. *See id.* ¶¶ 15-18. But the FAC fails to outline what symptoms each patient had, and what screening procedures Defendants provided to those patients as compared to Plaintiff. *See id.* ¶¶ 15-18. As a result, Plaintiff simply has not provided enough information to make any plausible comparisons.[5] *See Jackson*, 246 F.3d at 1255.

The court therefore GRANTS Defendants' Motion to Dismiss Plaintiff's EMTALA claim based on disparate treatment, with leave to amend.

c.   *Failure to follow procedures*

The FAC asserts that Defendants violated their procedures and standards (1) providing that inability to pay for care should not prevent a patient from receiving medically necessary services; (2) requiring good judgment, high ethical standards, compassionate and appropriate care; and (3) requiring Defendants to keep honest and professional records. Doc. No. 21, FAC ¶¶ 45-47.

---

[5] With respect to the MRI scan, the FAC does not assert any facts, aside from the nurse's alleged statement, that such a scan is typically offered to patients with symptoms similar to his. Doc. No. 21, FAC ¶¶ 14, 60. Indeed, only one of Plaintiff's example patients actually received an MRI scan, according to the FAC. *Id.* ¶ 16. And again, EMTALA does not impose liability on hospitals for failing to provide medical procedures outside their emergency department's capacity. *See* 42 U.S.C. § 1395dd(a); *Jackson*, 246 F.3d at 1254-55.

Further, at the hearing on the Motion, Plaintiff's attorney indicated that the other patients' information was obtained via Google searches about necrotizing fasciitis. Needless to say, the mere fact that a Google search disclosed that other patients were diagnosed with necrotizing fasciitis at WMH, standing alone, is not a plausible basis for a disparate treatment claim.

Although the FAC does not specify how Defendants allegedly violated each of these policies, it appears that (1) and (2) are based on Defendants' provision of allegedly inappropriate, cursory, and/or disparate treatment, possibly motivated by Plaintiff's employment and insurance status.[6] *See id.* ¶¶ 48, 50. In support of (3), the FAC points to (a) a nurse's uncharted assertion to Plaintiff on May 24, 2012 that MRI and CT scans are usually used for symptoms such as Plaintiffs; and (b) the failure to chart Plaintiff's low blood pressure test taken by the clinic staff on May 24, 2012. *Id.* ¶ 47.

These allegations are insufficient to state a plausible claim based on Defendants' failure to follow their own procedures -- the policies and standards identified in the FAC are so vague that they place no clear obligations upon Defendants, and have no clear relevance to the EMTALA screening claims in this case. Specifically, the FAC does not establish that any of the polices identified are *screening procedures* or are otherwise related to Defendants' EMTALA obligation to provide Plaintiff with appropriate medical screening. *Cf. Battle v. Mem'l Hosp. at Gulfport*, 228 F.3d 544 (5th Cir. 2000) (discussing claim that hospital failed to follow standard procedure providing that "[i]nfants and elderly are usually

---

[6] The FAC further asserts that Defendants were aware that if Plaintiff was properly screened, his hospital stay would have lasted four to six weeks. Doc. No. 21, FAC ¶¶ 50-51.

hospitalized if no definitive source for fever/infection" is determined). And although Plaintiff claims that Defendants violated their standard of care by discriminating against him because of his employment and insurance status, the FAC fails to allege any *facts* establishing that Plaintiff was treated differently based on his financial status in either of his hospital visits. *See* Doc. No. 21, FAC ¶¶ 51, 53. Finally, to the extent Plaintiff asserts that Defendants failed to chart his low blood pressure or the assertion of their nurse, the FAC provides no allegations explaining how these omissions are linked to Plaintiff's injury or amount to an EMTALA claim. *See id.* ¶¶ 43, 47.

The court therefore GRANTS Defendants' Motion to Dismiss Plaintiff's EMTALA claim based on failure to follow their own procedures, with leave to amend.

## 2. *Failure to Stabilize and/or Transfer*

The FAC alleges that Defendants violated § 1395dd(b) when they failed "to provide further examination and treatment required to stabilize [Plaintiff's] medical condition, or to transfer Plaintiff to another facility." *Id.* ¶¶ 61, 63. The FAC appears to base this claim on Plaintiff's treatment on May 24 and May 27, 2012, including the failure to transfer Plaintiff to another facility for an MRI, Defendants' delays in performing tests to diagnose Plaintiff's necrotizing

25

fasciitis, treating Plaintiff for necrotizing fasciitis, and transferring Plaintiff. *Id.* ¶¶ 60, 63-77.

These allegations are insufficient to allege a plausible failure to stabilize or failure to transfer claim. As to a failure to stabilize, the allegations regarding the May 24, 2012 ER visit are insufficient because Defendants were obligated to stabilize only the medical conditions they actually diagnosed, not what Plaintiff alleges they should have identified. *See Eberhardt*, 62 F.3d at 1259. Although Plaintiff asserts that Defendants *should have* detected his necrotizing fasciitis, Doc. No. 21, FAC ¶¶ 13, 23, Plaintiff does not allege that Defendants *did* diagnose him with necrotizing fasciitis. *See id.* ¶¶ 13, 22, 61. Rather, Plaintiff was only diagnosed with a viral infection and an ankle sprain on May 24, 2012, for which he was treated. *Id.* ¶¶ 13, 25. Again, EMTALA is not a medical malpractice statute, and failing to correctly diagnose Plaintiff's illness does not give rise to liability under § 1395dd. *See Bryant*, 289 F.3d at 1165.

Plaintiff has also failed to state a stabilization claim with respect to his second ER visit on May 27, 2012. His second visit resulted in his admission to the hospital, *see* Doc. No. 21, FAC ¶ 68, and as a result, Defendants' duty to stabilize Plaintiff ended when he was admitted to WMH. *See Bryant*, 289 F.3d at 1168.

As to a failure to transfer, the FAC asserts that Defendants should have, but did not, transfer Plaintiff to another facility. Doc. No. 21, FAC ¶¶ 63, 72. This assertion falls outside EMTALA's transfer provisions -- once an emergency medical condition is detected, § 1395dd(b) requires hospitals to stabilize the medical condition *or* transfer the patient to another facility. 42 U.S.C. § 1395dd(b). The facts alleged in the FAC suggest that Defendants elected to admit Plaintiff to their ER to provide further examination, *see* Doc. No. 21, FAC ¶¶ 64, 67, and then elected to admit him to the hospital instead of transferring him. *Id.* ¶ 68. And, as with his stabilization claim for this visit, any EMTALA requirement to transfer Plaintiff ended when he was admitted to WMH. *See Bryant*, 289 F.3d at 1168.

In opposition, Plaintiff asserts that the delay in admitting him to the hospital on May 27, 2012 is actionable under § 1395dd(h), which prohibits hospitals from delaying the provision of medical screening or treatment "in order to inquire about [a patient's] method of payment or insurance status." Doc. No. 51, Pl.'s Opp'n at 29; 42 U.S.C. § 1395dd(h). The FAC, however, does not allege (that is, set forth any facts) that Defendants delayed treatment or screening in order to inquire about Plaintiff's financial status. In fact, the FAC asserts that his status was known to Defendants almost immediately after he arrived at the ER. Doc. No.

21, FAC ¶¶ 9, 10, 27.  As a result, the FAC does not state a plausible claim for violation of § 1395dd(h).

In sum, the court GRANTS Defendants' Motion to Dismiss as to Plaintiff's failure to stabilize and failure to transfer claims, with leave to amend.

## V.  <u>CONCLUSION</u>

Based on the above, the court GRANTS Defendants' Motion to Dismiss with leave for Plaintiff to amend as stated in this Order.  By August 17, 2015, Plaintiff may file a Second Amended Complaint.  Plaintiff is notified that a Second Amended Complaint will supersede the FAC.  *Ferdik v. Bonzelet*, 963 F.2d 1258, 1262 (9th Cir. 1992); *Hal Roach Studios v. Richard Feiner & Co.*, 896 F.2d 1542, 1546 (9th Cir. 1990).  After amendment, the court will treat the FAC as nonexistent.  *Ferdik*, 963 F.2d at 1262.  Leave to amend is limited to the claims addressed in this Order; if Plaintiff wishes to assert any new claims, he must

///

///

///

///

///

///

comply with Rules 15 and/or 16.  If Plaintiff fails to file a Second Amended

Complaint by August 17, 2015, this action will be closed.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, July 22, 2015.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Leimbach v. Haw. Pac. Health, et al.*, Civ. No. 14-00246 JMS-RLP, Order Granting Defendants'
Motion to Dismiss Complaint, Doc. No. 31

29