```
1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF HAWAII

3
     MATTHEW R. LEIMBACH,          ) CIVIL NO. 14-00246JMS-RLP
4                                  )
               Plaintiff,          ) Honolulu, Hawaii
5                                  ) June 29, 2015
          vs.                      ) 11:03 A.M.
6                                  )
     HAWAII PACIFIC HEALTH;        ) [31] DEFENDANTS HAWAII
7    WILCOX MEMORIAL HOSPITAL;     ) PACIFIC HEALTH; WILCOX
     KAUAI MEDICAL CLINIC,         ) MEMORIAL HOSPITAL; AND KAUAI
8                                  ) MEDICAL CLINIC'S MOTION TO
               Defendants.         ) DISMISS PLAINTIFF'S FIRST
9    _____) AMENDED COMPLAINT

10
                     TRANSCRIPT OF PROCEEDINGS
11        BEFORE THE HONORABLE J. MICHAEL SEABRIGHT,
                  UNITED STATES DISTRICT JUDGE
12
     APPEARANCES:
13
      For the Plaintiff:       STEPHEN M. SHAW, ESQ.
14                             P.O. Box 2353
                               Honolulu, Hawaii  96804
15

16    For Defendants Hawaii    WILLIAM S. HUNT, ESQ.
      Pacific Health,          JAN M. VERNON, ESQ.
17    Wilcox Memorial          Alston Hunt Floyd & Ing
      Hospital, and Kauai      1001 Bishop Street, Suite 1800
18    Medical Clinic:          Honolulu, Hawaii  96813

19

20    Official Court           Cynthia Fazio, RMR, CRR
      Reporter:                United States District Court
21                             P.O. Box 50131
                               Honolulu, Hawaii  96850
22

23

24
     Proceedings recorded by machine shorthand, transcript produced
25   with computer-aided transcription (CAT).
```

```
 1   MONDAY, JUNE 29, 2015                         11:03 A.M.

 2        THE CLERK:  Civil Number 14-246JMS-RLP, Matthew

 3   Leimbach versus Hawaii Pacific Health, et al.

 4        This case has been called for a hearing on Defendants

 5   Hawaii Pacific Health; Wilcox Memorial Hospital; and Kauai

 6   Medical Clinic's Motion to Dismiss Plaintiff's First Amended

 7   Complaint.

 8        Counsel, please make your appearances for the record.

 9        MR. SHAW:  Morning, Your Honor.  Stephen Shaw on

10   behalf of opposing party Mr. Matthew Leimbach.  Mr. Saccoccio

11   will not be appearing with me this morning.

12        THE COURT:  All right.  Good morning.

13        MR. HUNT:  Good morning, Your Honor.  William Hunt and

14   Jan Vernon appearing for the defendants.

15        THE COURT:  All right.  Yes, good morning.

16        MS. VERNON:  Morning.

17        THE COURT:  All right.  Mr. Hunt, are you up?

18        MR. HUNT:  Thank you.  We're asking the Court to have

19   this complaint dismissed since the plaintiff did not and cannot

20   plead a legitimate claim under EMTALA.  We've requested the

21   Court consider the complete emergency department of records

22   that we have attached to the complaint.  And under Iqbal and

23   the Ritchie case we believe the Court has the discretion to do

24   that to get a complete, accurate history of what actually

25   happened in this case rather than the very misleading portions
```

1   that were quoted by the plaintiff in their -- in his complaint.

2         And we believe it's only fair the defendants have the

3   complete factual record in front of the Court because here the

4   medical record demonstrates that Mr. Leimbach had a complete

5   and full screening examination both times that he went to the

6   emergency department.

7         The Iqbal case requires that a claim for relief must

8   be plausible on its face and that the Court can draw a

9   reasonable inference based on the Court's judicial experience

10  and common sense as to whether or not the defendant is liable.

11  And we believe that there's sufficient evidence and allegations

12  before the Court for the Court to do that.

13        The complaint read by itself or even in conjunction

14  with the medical records that we have attached demonstrate that

15  the plaintiff cannot set forth an EMTALA claim that's plausible

16  on its face.  There was no refusal to treat Mr. Leimbach

17  because he was uninsured or for any other reason.  In fact, as

18  the Court held in the Eberhardt case:  The purpose of EMTALA is

19  to ensure that the hospitals do not refuse essential emergency

20  care because of the patient's inability to pay.  It doesn't

21  require a correct diagnosis, which is basically what they are

22  claiming here.  There can be no EMTALA claim unless there's an

23  allegation and evidence that the procedure followed was not

24  designed to identify an emergency medical condition.  And that

25  is clearly not the case here.

1          In the first emergency department visit, if you look

2    at just the allegations in the complaint, he had a full work --

3    emergency department workup over close to five hours, including

4    physical examinations by a nurse who took blood pressure,

5    temperature and other readings, and a complete blood test as

6    well as an X-ray of his ankle because he had a history of

7    jumping off a truck.  There could be no question that the

8    emergency department provided an adequate and appropriate

9    medical examination under the circumstances for this type of

10   complaint.  His condition was, as presented at that time, was

11   diagnosed, treated and stabilized.

12          At best the plaintiff here alleges a medical

13   malpractice case, and as the court held in Baker and the Bryant

14   cases, EMTALA does not create a national standard of care.  And

15   as the court noted in Eberhardt and Jackson, negligence in

16   screening or diagnostic process does not violate EMTALA.

17          Bryant, Jackson and Eberhardt courts have all held the

18   hospital's only duty is to stabilize conditions that its staff

19   detects after a screening examination.

20          Jackson found that sufficient extreme examination

21   included multiple tests, examination by a nurse and a doctor as

22   occurred here.

23          Here in the first emergency department visit

24   Mr. Leimbach received a lengthy evaluation, a diagnosis of a

25   viral syndrome and an ankle sprain.  He had an X-ray of his

1    ankle, multiple blood tests and a diagnosis reached, he was

2    stabilized and he was discharged, he did not return for three

3    days.

4          The second visit, which is also part of their

5    complaint, ended with him being hospitalized.  He never was

6    discharged from the emergency department.  He was hospitalized

7    within several hours of presentation at the emergency

8    department and operated on the next day.

9          There is no EMTALA claim on that second visit since he

10   was never discharged from the emergency department, he was

11   admitted to the hospital.  And under the Bryant case and other

12   Ninth Circuit cases clearly there was no EMTALA claim in that

13   situation.

14         Even at that time, if you just look at the allegation

15   in the complaint, the complaint admits that the surgeon who did

16   surgery the next day didn't even find necrotizing fasciitis.

17   At best he said it's a possible very early necrotizing

18   fasciitis and he found that the fascia was intact.  So their

19   argument that he was suffering from necrotizing fasciitis four

20   days earlier and that the emergency department missed that,

21   again, that's a negligence claim.  But even if true, that's not

22   shown by the records that are before the Court and even in the

23   complaint allegation.

24         This is not a case such as one cited by the plaintiff

25   where the patient was turned away by the receptionist with an

1    obvious bleeding hand and not seen by any doctor.

2              Finally, it's also clear that all of defendants other

3    than Wilcox are not appropriate EMTALA defendants under this

4    claim.

5              THE COURT:  So it should just be a hospital, right, in

6    your view?

7              MR. HUNT:  Yes.  And I think it's clear from Eberhardt

8    and the other cases that only a hospital is -- that treats,

9    diagnoses, treats and cares for patients is the appropriate

10   defendant.  And there's no allegation that any of these other

11   defendants had any duty to diagnose, treat or care for the

12   patient.  And he's got the hospital in here as a defendant.

13             THE COURT:  All right.  Well, I think I have a good

14   handle on the facts and the EMTALA claim.  The claim for

15   declaratory relief I'm a bit confused by and I can talk to

16   Mr. Shaw about this.

17             MR. HUNT:  Thank you.

18             THE COURT:  But as I understand it, he seeks a

19   declaratory judgment that he doesn't have to go to MICP with

20   the EMTALA claim is what he's seeking.  Is there a dispute as

21   to that?

22             MR. HUNT:  And I don't understand it because we went

23   to the MICP in this case.  So, I'm not quite -- I think it's a

24   question that's moot.

25             THE COURT:  Did you go on negligence claims or the

1    EMTALA claim?

2            MR. HUNT:  I think both.  I believe both.

3            THE COURT:  Is it necessary to go to the MICP --

4            MR. HUNT:  I believe that --

5            THE COURT:  -- on the EMTALA claim.

6            MR. HUNT:  No, I believe the federal courts --

7            THE COURT:  It's not, right?

8            MR. HUNT:  -- have held that it's -- they're not

9    required to follow state administrative proceedings.

10           THE COURT:  Right.  Right.  Okay.  All right.  Thank

11   you.

12           Mr. Shaw.

13           MR. SHAW:  Should I?

14           THE COURT:  Up to you.  Up to you.  Just so I can hear

15   you.

16           MR. SHAW:  Thank you.

17           On the exhibit, looking at the Ritchie case that was

18   cited by the movant, it says that none of the attached

19   documents form the basis of, I believe it was Horner's

20   complaint and she did refer extensively to any of them.  That's

21   what we have done.  We're not basing our entire complaint on

22   excerpts from the medical chart.  Our entire complaint is based

23   on the elements of an EMTALA case.

24           THE COURT:  Well, let me stop you because I'm a little

25   confused.  Are you objecting to me considering those medical

1    records?

2          MR. SHAW:  I am.  I don't think that that's

3    appropriate right now and it's not a -- I wouldn't like this

4    converted over to an MSJ because we need to do discovery.

5          THE COURT:  No, I'm not going to do that.  That's not

6    my intent to do that, but --

7          MR. SHAW:  Right, I --

8          THE COURT:  -- I'm not sure if it's not appropriate to

9    do, though, where you do refer in the complaint to medical

10   records.

11         MR. SHAW:  I understand.  And, you know, the reason

12   that I do is because of Iqbal and the related cases that

13   require us to be more, I would say, factual in our pleading

14   than we had to be before those cases.

15         The same goes with the issue of whether or not there

16   is -- the disparate treatment was because of inability to pay.

17   We don't really have to have that in there, but it's part of

18   the factual overlay of the case.

19         THE COURT:  Well, I'm just talking about, aside from

20   this case for a minute, I mean just a procedural -- federal

21   procedure essentially.

22         MR. SHAW:  Understood.

23         THE COURT:  When you do reference, which you do a good

24   deal, about the medical conditions and what was -- what was

25   observed and done in the ER and the hospital, it seems to me I

1    can take into account those medical records then because the

2    complaint does rely on them.  Maybe not totally, I understand

3    that, but your complaint does have a heavy dose of reference to

4    what happened medically while in the emergency room on both

5    occasions.

6          MR. SHAW:  I understand, but it's -- the problem with

7    just those documents is that I think under the rule of

8    completeness not everything is charted that's done.  And if we

9    were to allow those records that are just the records of

10   certain things that were -- they decided to put into the

11   medical chart, then a whole bunch of other things, for

12   instance, things that my client told people that aren't

13   charted, it would seem that those would be valid to consider.

14   And so this record or this proffer is not complete.

15         THE COURT:  All right.  Okay.

16         MR. SHAW:  Then on the issue of whether or not this

17   hospital is -- what status the Hawaii Pacific Health has, at

18   our Paragraph 35 we go into defendant hospital is a principal

19   or franchisor, and that's at Document 21, Page 17.

20         THE COURT:  Well, let me say this, what I usually

21   would require in a case of this sort, and I don't know if I'm

22   going to -- this would be true whether I deny the motion or

23   grant the motion with leave to amend and then you amend,

24   whichever way I go on it, it is to see if you can reach an

25   accomodation as to who the appropriate defendant is and that

1  would -- and if you have some questions as to that, I think you

2  can talk to Mr. Hunt and get an agreement from him that if

3  there is liability Wilcox is the appropriate defendant and

4  would be financially responsible for any potential --

5      MR. SHAW:  That would be fine with me to --

6      THE COURT:  And that usually is the way I work these

7  things out is to have counsel sit down.  Because what Mr. Hunt

8  is saying is it should be Wilcox, and you're saying, Well, I'm

9  not so sure.  But if you can get in writing from him yes, it is

10 Wilcox and should there be a settlement slash judgment of some

11 sort in the case down the road, Wilcox admits that it would be

12 the responsible party for it, then that would satisfy your

13 concerns, it seems to me.

14     MR. SHAW:  Sure, I think we could -- we could work it

15 out and I'd be happy to do that, or try to do that.

16     THE COURT:  And that just takes away, you know, the

17 unnecessary parties in that instance.  And so whether I go

18 forward -- I'm sorry, whether I grant the motion with leave to

19 amend or deny the motion, or grant the motion in part and deny

20 in part, whatever I might do, I'm going to ask that you folks

21 get together and have that discussion.  I assume you can work

22 that out, Mr. Hunt.

23     MR. HUNT:  I believe we can, Your Honor.

24     THE COURT:  All right.  Okay.

25     MR. HUNT:  Thank you.

1          THE COURT:  All right.  So that's a small matter, but

2    make sure you get together, at least after my order comes out,

3    to have that discussion.  Okay?

4          MR. SHAW:  I think that I've briefed this, but it's

5    worth repeating.  The elements in this EMTALA case on our Count

6    1 and Count 3 --

7          THE COURT:  Of Claim 1 or --

8          MR. SHAW:  Of Claim 1, yes.

9          THE COURT:  It's very confusing the way you pled this.

10         MR. SHAW:  I'm sorry.  And I'm looking at the Jackson

11   case where it says at 246 F.3d 1248 at 1256:  We now adopt this

12   comparative test.  We hold that a hospital satisfies EMTALA's

13   appropriate screening requirement if it provides a patient with

14   an examination comparable to the one offered to other patients

15   presenting similar symptoms.

16         That would be Count 1 and Count 3 of our first claim,

17   which is a disparate --

18         THE COURT:  As I understand your counts there are

19   different methods of proof to get to the screening provision of

20   EMTALA; is that accurate?

21         MR. SHAW:  I think they're actually separate causes of

22   action because as I go in --

23         THE COURT:  Well, I have a problem with that, I'll

24   tell you that now, to have a separate cause of action.  It

25   seems to me different proof.

 1          MR. SHAW:  Well --

 2          THE COURT:  I'm not sure how to instruct the jury on

 3   that necessarily, I haven't thought about through that, but

 4   there's one -- you know, there's two ways to violate EMTALA,

 5   right, two statutory provisions.

 6          MR. SHAW:  Right.  But I think if you go backwards to

 7   the first days of EMTALA.  One was, you know, you would -- the

 8   hospital would kick someone out because they couldn't pay.

 9   That's -- that was disparate treatment, person's too poor.

10          THE COURT:  But there's screening.  And that gets to

11   screening, right?

12          MR. SHAW:  It does get to screening.

13          THE COURT:  And it's how you prove that they're not

14   doing the screening it seems to me.

15          MR. SHAW:  Well, the thing is that the second part of

16   that language is unless the examination is so cursory that it

17   is not designed to identify acute and severe symptoms that

18   alert the physician of the need for immediate medical attention

19   to prevent serious bodily injury.

20          I don't think the Ninth Circuit meant to put that

21   phrase that I just read ahead of disparate screening.  And I

22   say this because in the reply I see that -- to show disparate

23   screening we would have to go on and prove, plead and prove

24   designed to identify acute and severe symptoms.  And I believe

25   those are two different, I would say causes of action or claims

1    because of the proof requirement.  I don't believe that for a

2    disparate claim, disparate examination claim that we have to go

3    through that type of proof.  The reason is that there are so

4    many ways to treat someone differently.  One is at the

5    threshold where they come in and the receptionist says go to

6    the VA, take the ambulance.  Ambulance driver, you guys get up

7    to VA right now because we don't treat any VA people, and the

8    person dies right there.  I don't think that the Ninth Circuit

9    meant to require that same amount of proof for a cursory -- I

10   would say a cursory examination claim.

11         And the word "cursory" is a little bit I think

12   confusing to many courts because some of them seem to be

13   requiring, as Mr. Hunt is arguing, oh, look, all these tests

14   were done and everything is, you know, was fine and there's no

15   problem.  Just because of the quantum of tests that were done,

16   if you take this phrase that I last read, just because there

17   were a lot of things done doesn't mean that it was designed to

18   identify acute and severe symptoms.

19         So, Your Honor, I've read this and reread it and I've

20   tried to -- I've struggled with the same thing.  Is it one

21   cause of action with a whole bunch of different elements of

22   proof or do we break -- does the Ninth Circuit want us to break

23   this up into two.  And tracking through the other

24   jurisdictions, it seems to me that cursory comes up at one type

25   of claim that can be brought under EMTALA.  The other one is

 1    disparate treatment.  And they overlap, some of the

 2    decisions --

 3          THE COURT:  I mean it may be it may ultimately be

 4    irrelevant, because I mean if you prevail you get one set of

 5    damages, you don't get 2 set of damages --

 6          MR. SHAW:  That's true.

 7          THE COURT:  -- for different types of breach if that's

 8    what you're --

 9          MR. SHAW:  They do overlap and the courts -- sometimes

10    they'll find, they'll say, Well, look, we've got a cursory

11    issue here, and they'll go into disparate treatment and it gets

12    confusing.  Whereas the other area is on our, I believe it's

13    our third count where we're arguing that they didn't follow

14    their practices and procedures, then you start getting into

15    disparate treatment even though it may be a cursory examination

16    issue.

17          THE COURT:  All right.

18          MR. SHAW:  So, the other issue that came up in some of

19    the pleading was whether or not we have to have -- what's our

20    standard, do we have to show exact symptoms?  And I saw that in

21    some of the opposition argument.

22          The case law is to other patients with similar

23    symptoms.  And I don't believe that at the pleading stage that

24    we would be required to show evidence of a lot of other people

25    with similar symptoms, but we have.  We've shown enough to get

1    in the door.  That there were people that were coming in with

2    flesh eating bacteria symptoms and they were treated

3    differently.  And I think that's -- we don't have to plead at

4    this stage a close identity of symptoms.  I think it comes up

5    in discovery and expert witnesses where they start to fight

6    over whether or not the symptoms were similar under, I

7    believe -- yes, this is Jackson versus eBay at 246 F.3d at

8    12 -- Page 1256 where the language is similar symptoms.

9           So, if somebody is coming in and they've got, for the

10   pleading purposes that they've got some flu-like symptoms, a

11   swelling of a leg, and those people were all given MRI's and

12   they happened to have had insurance or some other feature, or

13   no reason at all, and then another person comes in and gets no

14   MRI and has similar symptoms, then I think for at least

15   pleading purposes we've met that standard.

16          Again, Count 2 I've already argued on that one.

17          And the other -- the second and third claims I would

18   submit on the pleadings.

19          THE COURT:  All right.  Thank you, Mr. Shaw.

20          MR. SHAW:  Thank you, Your Honor.

21          THE COURT:  Mr. Hunt?

22          MR. HUNT:  The only thing I would add, Your Honor, is

23   at least with --

24          THE COURT:  I'm sorry, I didn't hear you.

25          MR. HUNT:  I'm sorry.  The only thing I would add is

 1    with regard to the second emergency room visit, I mean it's

 2    clear he was admitted.  And the law is clear that once you're

 3    admitted there can be no EMTALA claim.  He was never discharged

 4    from the ER, he was allowed -- he remained in the ER because

 5    they didn't have a bed, as we've shown in the record.

 6         THE COURT:  What time period do I look at, when he was

 7    admitted to the hospital or are you admitted to the emergency

 8    room?  I mean he goes to the emergency room, he was admitted at

 9    some point, but a bed wasn't available, or something happened,

10    there was a bit of delay before he got out of the emergency

11    room, right?

12         MR. HUNT:  Yes.

13         THE COURT:  Okay.  So what point is your view EMTALA

14    cuts off?

15         MR. HUNT:  As soon as he's admitted to the hospital.

16         THE COURT:  That time of admission.

17         MR. HUNT:  Right.

18         THE COURT:  All right.

19         MR. HUNT:  And in addition, it doesn't really matter

20    because he never left the emergency room.  They never

21    discharged him or transferred him without stabilizing him.  He

22    stayed there, he was stabilized, he was admitted in the

23    hospital.

24         THE COURT:  So let me ask you about the other

25    individuals who apparently had NF and the comparative analysis

1    that Mr. Shaw has put forward.

2                MR. HUNT:  I'm not quite sure what you're asking, Your

3    Honor.

4                THE COURT:  Well, he had these three other

5    individuals -- I think it was three, maybe four -- who came

6    into the hospital he said were treated differently.

7                MR. HUNT:  That's what he said.  Now, we haven't gone

8    back because we can't --

9                THE COURT:  No, no, but why is that not enough, is my

10   question to you.

11               MR. HUNT:  Because I believe if you look at each of

12   those -- I mean the issue is really not who comes to the

13   hospital with necrotizing fasciitis, but who comes to the ER

14   with, you know, cold symptoms and a swollen ankle after jumping

15   off a truck.  Do they all get MRI's?  I don't believe so.  He's

16   quoted people that -- one is a toddler, you know, a kid,

17   another one -- I mean there's -- even on their face they're

18   significantly different than Mr. Leimbach's situation.  And I

19   don't believe that he sufficiently alleged that --

20               THE COURT:  So your view is they're not similarly

21   situated, that's --

22               MR. HUNT:  Correct.

23               THE COURT:  -- the bottom line.  Okay.  All right.

24               MR. HUNT:  Right.  You can't compare people that were

25   diagnosed with necrotizing fasciitis at the time in the

1    emergency room to someone who comes in with cold symptoms and a

2    swollen ankle after jumping off a truck and doesn't come back

3    for three days.

4         THE COURT:  You know, one thing -- and this is -- has

5    nothing to do with the merits, I was a little concerned about

6    was your naming those people as opposed to using the initials

7    in the complaint, Mr. Shaw.

8         MR. SHAW:  Well, thanks to Google --

9         THE COURT:  That may be, I understand.  I figured that

10   there were some degree of public record on this.

11        MR. SHAW:  These are from news articles.

12        THE COURT:  What I'd ask you to do, just ask, I'm not

13   ordering, think about if I do dismiss this and give you leave

14   to amend, if you do come back, use initials, but then you can

15   just tell the opposing side who that person is.

16        MR. SHAW:  That would be fine, Your Honor.

17        THE COURT:  You know, just to protect them a little

18   bit.  Because if the news picks up on this these are the sort

19   of things people don't want --

20        MR. SHAW:  Okay.  That's fine.  As far as the issue of

21   being left in an emergency room before one is admitted, I

22   couldn't find a case where delay, delayed admission, when

23   you're under the umbrella of the hospital that has an emergency

24   department, what I'm characterizing this as is just storing

25   somebody until they could get whatever approval they needed or

1    someone out of a bed in the hospital in order to admit them.

2    So the claim is not based on failure to admit, the claim is

3    based on a delayed admission.  And when -- it wouldn't

4    matter --

5         THE COURT:  The problem is it doesn't look like

6    dumping, right?  I mean it is an anti-dumping statute.  It sure

7    doesn't look like dumping when they admit him.  Now, there's a

8    delay.  Well, delay can be for a lot of reasons in getting that

9    bed in a hospital.  But there doesn't appear to be any effort

10   to dump in any way when they admit him.  And a delay doesn't

11   add to an argument there is some sort of dumping.

12        MR. SHAW:  I understand, but factually this is a fast

13   growing deadly bacteria.  I know that I'm not arguing this is a

14   malpractice or anything like that, but what I'm arguing is you

15   have to consider when you delay admit somebody, that it is

16   the -- it could be the same as dumping because of the

17   condition.  For instance, when you tell somebody --

18        THE COURT:  All right.  I think I understand the

19   arguments.

20        MR. SHAW:  Thanks.

21        THE COURT:  But on the declaratory judgment, do we

22   really need to go down that road?  I mean do we have an

23   agreement that there's no -- EMTALA doesn't require exhaustion

24   through the MIPC?

25        MR. SHAW:  I would accept that.

1              THE COURT:  Under federal law?  You agree with that,

2    Mr. Hunt?

3              MR. HUNT:  Yes, Your Honor.  And as I said, I think

4    it's moot because we did it.

5              THE COURT:  Okay.  So with that --

6              MR. SHAW:  Yes.

7              THE COURT:  -- are you satisfied?

8              MR. SHAW:  That's it.  That would satisfy that.

9              THE COURT:  So how do you want to handle it, just

10   withdraw that count based on the representations?

11             MR. SHAW:  I'd like you to write it in your opinion so

12   from now on --

13             THE COURT:  My problem is I'm not sure it's -- I don't

14   necessarily bid; on subject matter jurisdiction, but I don't

15   have to exercise, I have discretion whether to exercise under

16   the Declaratory Judgment Act.  And I'm not sure it's really

17   ripe.  I'm not sure there's a controversy involving it at this

18   point.  And that's why I have some trouble and I don't want to

19   go down that road if I don't have to.

20             MR. SHAW:  I understand.  It's just at the plaintiff's

21   end it's a very costly decision to make and very -- if this

22   were a pure EMTALA claim, let's say patient dumping only, VA

23   involved.

24             THE COURT:  Yeah.

25             MR. SHAW:  It's a very, very -- it involves statute of

1    limitations, it involves trying to get --

2              THE COURT:  Well, this isn't a class action.  I mean

3    I'm not helping you with other cases here.

4              MR. SHAW:  Oh, no, but I'm talking about people that

5    come in that have to do this --

6              THE COURT:  But that doesn't matter to me.  This is

7    this case we're talking about.

8              MR. SHAW:  Understood.

9              THE COURT:  And it sounds like you've already gone

10   through the process in this case, whether you should have or

11   not, and there's an agreement you don't have to go through it.

12             MR. SHAW:  Right.  So it's moot.

13             THE COURT:  So it's moot.

14             MR. SHAW:  Thanks.

15             THE COURT:  Thank you all.  I'll put out a written

16   order.

17             MR. HUNT:  Thank you, Judge.

18             (The proceedings concluded at 11:28 a.m.,

19   June 29, 2015.)

20

21

22

23

24

25

1                    COURT REPORTER'S CERTIFICATE

2

3        I, CYNTHIA FAZIO, Official Court Reporter, United

4   States District Court, District of Hawaii, do hereby certify

5   that pursuant to 28 U.S.C. §753 the foregoing pages is a

6   complete, true, and correct transcript of the stenographically

7   reported proceedings held in the above-entitled matter and that

8   the transcript page format is in conformance with the

9   regulations of the Judicial Conference of the United Stated.

10       DATED at Honolulu, Hawaii, August 6, 2015.

11

12

13                     /s/ Cynthia Fazio
                       CYNTHIA FAZIO, RMR, CRR
14

15

16

17

18

19

20

21

22

23

24

25